617 F.2d 537
 J. Gregory MERRION and Robert L. Bayless, d/b/a Merrion and
Bayless, Jerome T. McHugh, Chase Oil Company, Dugan
Production Corporation, Consolidated Oil and Gas, Inc.,
Southland Royalty Company, Tesoro Petroleum Corporation,
Amerada Hess, Supron Energy Corporation, Energy Reserves
Group, Inc., J. M. Huber Corporation, Continental Oil
Company, Atlantic Richfield Company, Phillips Petroleum
Company, Tenneco Oil Company, Getty Oil Company, and Gulf
Oil Corporation, Plaintiffs-Appellees,
v.
JICARILLA APACHE TRIBE, Jicarilla Apache Tribal Council, and
Cecil Andrus, Secretary of the Interior,
Defendants-Appellants,
Mobile Oil Corporation and Oxy Petroleum, Inc.,
Intervenors-Appellees.
AMOCO PRODUCTION COMPANY and Marathon Oil Company,
Plaintiffs-Appellees,
v.
JICARILLA APACHE TRIBE, Jicarilla Apache Tribal Council,
Gwendolyn Velarde, Treasurer of the Jicarilla
Apache Tribe, Cecil Andrus, Secretary of
the Interior, Defendants-Appellants.
 Nos. 78-1154, 78-1251.
 United States Court of Appeals,
Tenth Circuit.
 Argued and Submitted Sept. 12, 1979.
Decided Feb. 22, 1980.
Rehearing Denied April, 25, 1980.
 
 Robert J. Nordhaus and Terry D. Farmer of Nordhaus, Moses & Dunn, Albuquerque, N. M., for defendants-appellants Jicarilla Apache Tribe, Jicarilla Apache Tribal Council and Gwendolyn Velarde.
 Maryann Walsh, Atty., Washington, D. C. (James W. Moorman, Asst. Atty. Gen., Sanford Sagalkin, Deputy Asst. Atty. Gen., Neil T. Proto, Atty., Peter R. Steenland, Jr., Atty., Dept. of Justice, Washington, D. C., with her on the briefs), for defendant-appellant Cecil Andrus, Secretary of the Interior.
 Bruce D. Black of Campbell, Bingaman & Black, P. A., Santa Fe, N. M., and Jason W. Kellahin of Kellahin & Kellahin, Santa Fe, N. M., for plaintiffs-appellees Merrion and Bayless, et al.
 John R. Cooney of Modrall, Sperling, Roehl, Harris & Sisk, Albuquerque, N. M. (R. H. Landt of Amoco Production Company, Denver, Colo., Richard L. Marler of Marathon Oil Company, Findlay, Ohio, Mark B. Thompson, III, of Modrall, Sperling, Roehl, Harris & Sisk, Albuquerque, N. M., with him on the briefs), for plaintiffs-appellees Amoco Production Company and Marathon Oil Company.
 George P. Vlassis, Phoenix, Ariz. (Lawrence A. Ruzow, Katherine Ott, Gary Verburg, Phoenix, Ariz., of counsel), of Vlassis, Ruzow & Crowder, Phoenix, Ariz., filed an amicus curiae brief for the Navajo Nation.
 Reid Peyton Chambers of Sonosky, Chambers & Sachse, Washington, D. C. and Marvin J. Sonosky, Washington, D. C., of counsel, filed an amicus curiae brief for the Shoshone Indian Tribe and the Assiniboine and Sioux Tribes.
 Charles A. Hobbs, Washington, D. C., filed an amicus curiae brief for National Congress of American Indians, Inc., the Arapaho Tribe of the Wind River Reservation, and the Three Affiliated Tribes of The Fort Berthold Reservation.
 Toney Anaya, Atty. Gen., and Jan Unna, Sp. Asst. Atty. Gen. of N. M., Santa Fe, N. M., filed an amicus curiae brief for the State of New Mexico.
 Robert B. Hansen, Atty. Gen., Richard L. Dewsnup, Dallin W. Jensen, Frank V. Nelson, Asst. Attys. Gen. of Utah, Salt Lake City, Utah, filed an amicus curiae brief for the State of Utah.
 John J. Rooney, Acting Atty. Gen. of Wyoming, Cheyenne, Wyo., Allen I. Olson, Atty. Gen. of North Dakota, Bismarck, N. D., and Mike Greeley, Atty. Gen. of Montana, Helena, Mont., filed an amicus curiae brief for the States of Wyoming, North Dakota and Montana.
 Before SETH, Chief Judge, and HOLLOWAY, McWILLIAMS, BARRETT, DOYLE, McKAY and LOGAN, Circuit Judges (en banc).
 LOGAN, Circuit Judge.
 
 
 1
 This appeal arises out of two suits, consolidated for trial, brought by appellees against the Jicarilla Apache Tribe and its Tribal Council (the Tribe). Appellees (lessees), who are non-Indians, produce oil and gas from within the Tribe's reservation pursuant to leases granted them under the auspices of the Secretary of the Interior. After the Tribe enacted an oil and gas severance tax to be measured by production from oil and gas wells within the reservation, lessees sued the Tribe and Secretary of Interior, Cecil Andrus,[1] seeking a declaratory judgment and injunction that would prohibit enforcement of this tax. After a nonjury trial, the judge permanently enjoined enforcement declaring the tax "illegal, unconstitutional, invalid and void."
 
 
 2
 The issues on appeal are whether,
 
 
 3
 (1) the district court had jurisdiction over the claims against the Tribe and the Secretary of the Interior,
 
 
 4
 (2) the Tribe has the inherent power to levy the severance tax,
 
 
 5
 (3) the tax violates the Commerce Clause of the United States Constitution, and
 
 
 6
 (4) Congress preempted tribal taxation.
 
 
 7
 The Jicarilla Apache Tribe is an Indian Tribe occupying an executive order reservation in northwestern New Mexico. The Tribal Council is the legislative arm of the Tribe's government. In 1968 the Tribe adopted a revised constitution pursuant to the Indian Reorganization Act of 1934, §§ 16, 17, 25 U.S.C. §§ 476, 477. Article XI of that constitution provides, in pertinent part,
 
 
 8
 Section 1. The inherent powers of the Jicarilla Apache Tribe, including those conferred by Section 16 of the Act of June 18, 1934, (48 Stat. 984), as amended, shall vest in the tribal council and shall be exercised thereby subject only to limitations imposed by the Constitution of the United States, applicable Federal statutes and regulations of the Department of the Interior and the restrictions established by this revised constitution.
 
 
 9
 (e) Taxes and Fees. The tribal council may levy and collect taxes and fees on tribal members, and may enact ordinances, subject to approval by the Secretary of the Interior, to impose taxes and fees on non-members of the tribe doing business on the reservation.
 
 
 10
 The revised constitution was approved by the Under Secretary of the Interior in 1969.
 
 
 11
 In 1976 the Tribal Council adopted an ordinance imposing a severance tax on "any oil and natural gas severed, saved and removed from Tribal lands." The operators are required to pay the tax, which is due at the time of severance and is payable monthly. The tax rate is assessed at the wellhead per barrel of crude oil and per million BTU of natural gas "sold or transported off the Reservation." "Royalty gas, oil or condensate taken by the Tribe in kind, and used by the Tribe" is exempt from taxation. The Secretary, through the Acting Area Director of the Bureau of Indian Affairs, formally approved the tribal ordinance in December of 1976.
 
 
 12
 Among the trial court's findings of fact are the following: Approximately 80% of the oil and gas produced by lessees is shipped interstate for sale outside the state of New Mexico; the tax would generate over two million dollars annually; the lessees would be able to pass the majority of the tax burden on to their customers; if the lessees are required to absorb the tax, the ability of some of the lessees to operate profitably some of the existing oil wells on the reservation would be substantially limited; those lessees not able to profitably operate wells "would be required to shut down such wells resulting in a loss of natural resources and an unjust return of the wells to the Jicarilla Apache Tribe"; and the tax burden on the price of oil and gas would be more than 29% of the interstate price of old gas and over 12.5% of the price of old oil.
 
 
 13
 Based upon these findings the trial court held that (1) neither tribal sovereignty nor the Indian Reorganization Act of 1934 empower the Tribe to enact the tax; (2) 25 U.S.C. § 398c grants the State of New Mexico the exclusive right to tax lessees; and (3) the tax discriminates against and constitutes a multiple burden on interstate commerce in violation of the Commerce Clause.
 
 
 14
 * Before proceeding to the merits, we must consider two jurisdictional questions whether the trial court had jurisdiction to enjoin the Secretary of the Interior from taking any action to enforce the tax, and whether the court had jurisdiction over the Tribe.
 
 
 15
 Lessees sued the Secretary on the basis that in approving the Tribe's tax ordinance he violated the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 et seq. The APA is not an independent grant of federal jurisdiction. Califano v. Sanders, 430 U.S. 99, 105-07, 97 S.Ct. 980, 984-85, 51 L.Ed.2d 192 (1977). Since only injunctive relief is sought, an action can be maintained against the Secretary under the 1976 amendments to 5 U.S.C. § 702. Appellees admit waiving the defense that the Secretary improperly delegated his approval function to the local official of the Bureau of Indian Affairs. The only arguments made in this Court that the Secretary acted unlawfully under the APA go to the merits of the tax and are treated hereafter.
 
 
 16
 The Tribe asserts that under the doctrine of sovereign immunity it could not be sued and therefore the trial court was without jurisdiction,[2] citing Santa Clara Pueblo v. Martinez, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978) and United States v. United States Fidelity & Guar. Co., 309 U.S. 506, 60 S.Ct. 653, 84 L.Ed. 894 (1940). Those cases clearly hold a tribe cannot be sued absent consent. See also Puyallup Tribe, Inc. v. Department of Game, 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977). Here the Tribal Council, as the duly constituted legislative body of the Tribe, by the terms of the severance tax ordinance, expressly consented to suits against the Tribe in the United States District Court or in the Jicarilla Apache Tribal Court. The ordinance was approved by the representative of the Secretary of the Interior. The question is whether this constitutes effective consent.
 
 
 17
 We see no reason in principle or in law to conclude a Tribe that has taken advantage of Congress's encouragement to organize for purposes of providing for its common welfare under 25 U.S.C. § 476, has adopted a constitution, and has formally attempted to waive its sovereign immunity in this ordinance, may not do so. We believe the grant of power under the Indian Reorganization Act of 1934 is broad enough to encompass express waiver of sovereign immunity to suit when the ordinance, as here, has been specifically approved by the Secretary of Interior. We therefore hold the trial court had jurisdiction over the Tribe.[3]II
 
 
 18
 In treating the merits of this appeal, we first consider the basic question whether the Tribe may impose a tax upon nonmembers of the Tribe doing business within the Tribe's territorial jurisdiction. The tax instituted by the Tribe here is an excise or privilege tax imposed on the occupation of severing oil and gas from tribal land, measured by quantity produced. See Ohio Oil Co. v. Conway, 281 U.S. 146, 50 S.Ct. 310, 74 L.Ed. 775 (1930); Flynn, Welch & Yates, Inc. v. State Tax Comm'n, 38 N.M. 131, 28 P.2d 889 (1934). See also Oliver Iron Mining Co. v. Lord, 262 U.S. 172, 43 S.Ct. 526, 67 L.Ed. 929 (1923). Since no treaty or act of Congress specifically authorizes the exercise of such a taxing power, we must decide whether that power is among those "vested in any Indian Tribe or tribal council by existing law," Indian Reorganization Act of 1934, § 16, 25 U.S.C. § 476, i. e., whether the Tribe has the inherent power to levy this tax. In making this determination we recognize the fundamental principle that the power of taxation, which is essential to the very existence of self-government, is an attribute of sovereignty and extends generally to all that is within that government's territorial jurisdiction. M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 428-29, 4 L.Ed. 579 (1819).
 
 
 19
 It has long been recognized that Indian tribes, although once self-governing political nations, no longer possess the full attributes of sovereignty. Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978); The Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1, 8 L.Ed. 25 (1831). Nevertheless, the tribes are "unique aggregations possessing attributes of sovereignty over both their members and their territory." United States v. Mazurie, 419 U.S. 544, 557, 95 S.Ct. 710, 717, 42 L.Ed.2d 706 (1975); Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 557, 8 L.Ed. 483 (1832). They retain those powers of self-government not voluntarily relinquished by treaty, not divested by Congress in the exercise of its plenary authority over them, or not inconsistent with the superior interests of the United States as a sovereign nation. Oliphant, 435 U.S. at 208-09, 98 S.Ct. at 1020-21; United States v. Wheeler, 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978).
 
 
 20
 While the Supreme Court has not passed directly upon the question before this Court, it has determined that certain powers were not retained by the tribes upon their incorporation because of the superior interests of the United States. It has long been established, for example, that the tribes, though rightful occupants of the soil, may not convey it at their will, superior title having vested in the United States. Johnson and Graham's Lessee v. M'Intosh, 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681 (1823). Because of the United States interest in protecting its external political boundaries, the tribes as sovereign entities may not deal with foreign nations. The Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1, 17-18, 8 L.Ed. 25 (1831). Most recently, the Supreme Court determined that the tribes also gave up the power to exercise criminal jurisdiction over non-Indians, on the ground the power of the tribes to restrict the personal liberty of United States citizens' conflicts with the federal government's overriding interest in protecting its citizens "from unwarranted intrusions on their personal liberty." Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 210, 98 S.Ct. 1011, 1021, 55 L.Ed.2d 209 (1978).
 
 
 21
 We do not find that tribal tax legislation in the context of this case necessarily and in every instance implicates a sovereign federal interest in the same way criminal adjudication, sale of tribal land, and governmental dealings with foreign nations does. The federal taxing power is in no way impinged; clearly the federal government can tax non-Indians or Indians within the reservation whether or not the Tribe levies this tax. Nor is there a general sovereign interest in preventing persons from being taxed by governmental entities other than itself.
 
 
 22
 A national, if not sovereign, interest in preventing deprivations of property without due process is manifested in the Fifth and Fourteenth Amendments. In the context of taxing, however, that interest is implicated only in the extremely rare case in which the taxing power is so abused the result is in reality not a tax, "but constitutes, in substance and effect, the direct exertion of a different and forbidden power, as, for example, the confiscation of property." A Magnano Co. v. Hamilton, 292 U.S. 40, 44, 54 S.Ct. 599, 601, 78 L.Ed. 1109 (1934). See also City of Pittsburgh v. Alco Parking Corp., 417 U.S. 369, 94 S.Ct. 2291, 41 L.Ed.2d 132 (1974); Southwestern Oil Co. v. Texas, 217 U.S. 114, 30 S.Ct. 496, 54 L.Ed. 688 (1910). That is not the situation in the instant case.
 
 
 23
 Neither can we conclude that the "national interest in free and open trade" between the states, expressed by the Commerce Clause of the Constitution precludes tribal taxation. See Boston Stock Exch. v. State Tax Comm'n, 429 U.S. 318, 329, 97 S.Ct. 599, 606, 50 L.Ed.2d 514 (1977). Just as the clause serves only as a limitation on state taxation powers, id. at 329, 97 S.Ct. at 606, it limits but does not destroy tribal powers of taxation. See Part III, infra.
 
 
 24
 We recognize that in recent decisions bearing on the issue of inherent powers of Indian Tribes, the Supreme Court has occasionally employed language suggesting that Indians are without inherent powers over any nonmembers of their tribe. See Wheeler, 435 U.S. at 326, 98 S.Ct. at 1087; Oliphant, 435 U.S. at 208-11, 98 S.Ct. at 1020-22. For instance, the Court in Wheeler described powers not retained by tribes as those that "would necessarily be lost by virtue of a tribe's dependent status." 435 U.S. at 326, 98 S.Ct. at 1088. For several reasons we do not believe this language was intended to dispose of a case like the one at issue here.
 
 
 25
 First, the formulation seems to be merely descriptive of the conclusion that in certain circumstances powers were not retained, and is not a test for determining the existence of inherent powers. The critical factor in the cases is whether important interests of the United States, other than Congress's basic interest in regulating the affairs of the Indians, conflict with assertions of tribal authority. If the test is whether the asserted tribal power is inconsistent with its dependent status, then the focal point becomes the tribal position, which is always one of dependence upon the United States. Carried to its logical conclusion, such a test would mean that a tribe possesses no inherent powers even over its members, because the tribe's very existence would depend upon affirmative enabling legislation by Congress. To the extent a tribe could exert power over its members, that power could only derive from the tribe's existence as a private, voluntary association. These conclusions are fundamentally inconsistent, of course, with the teachings of other decisions of the Court. The Court has expressly rejected the contention the tribes are no more than private, voluntary associations, United States v. Mazurie, 419 U.S. 544, 557, 95 S.Ct. 710, 717, 42 L.Ed.2d 706 (1975), and has consistently held that tribal powers of self-government are inherent, derived from the tribe's original status as independent sovereign nations. E. g., United States v. Wheeler, 435 U.S. 313, 322-323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978); Talton v. Mayes, 163 U.S. 376, 16 S.Ct. 986, 41 L.Ed. 196 (1896).
 
 
 26
 Also persuasive are Supreme Court decisions to the effect that the tribe's retained powers have at least some elements of territoriality. As early as 1823 the Court recognized in Johnson and Graham's Lessee v. M'Intosh, 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681 (1923), that voluntary transactions of nonmembers with the Tribes or their members within the confines of the reservation would subject that nonmember, at least regarding that transaction, to the laws of the tribe. Id. at 593. Similarly, Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), held that a state court was without jurisdiction to hear a simple contract action brought by a nonmember against an Indian concerning a transaction entered into on the reservation. The Court's stated rationale was premised in part upon the territorial aspect of the tribe's right to self-government.
 
 
 27
 There can be no doubt that to allow the exercise of state jurisdiction here would undermine the authority of the tribal courts over Reservation affairs and hence would infringe on the right of the Indians to govern themselves. It is immaterial that respondent is not an Indian. He was on the Reservation and the transaction with an Indian took place there. . . . The cases in this Court have consistently guarded the authority of Indian governments over their reservations.
 
 
 28
 Id. at 223, 79 S.Ct. at 272 (citations omitted). See also United States v. Mazurie, 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975). While the territorial element of inherent tribal power is not necessarily exclusive, see, e. g., Moe v. Confederated Salish & Kootenai Tribes, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976); Thomas v. Gay, 169 U.S. 264, 18 S.Ct. 340, 42 L.Ed. 740 (1898), and may not exist in some circumstances, see Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978), we do not think the decisions eliminate this aspect of tribal powers.
 
 
 29
 We are also persuaded by "the commonly shared presumption of Congress, the Executive Branch, and the lower federal courts," Oliphant, 435 U.S. at 206, 98 S.Ct. at 1019, that the tribes retain the power to levy a tax that falls upon nonmembers doing business on the reservation. Prior to the Indian Reorganization Act of 1934, 25 U.S.C. § 476 (the Act), which was intended to facilitate tribal self-government, one decision by the Supreme Court and three by the Eighth Circuit approved imposition of tribal taxes on nonmembers doing business on the reservation. See Morris v. Hitchcock, 194 U.S. 384, 24 S.Ct. 712, 48 L.Ed. 1030 (1904); Buster v. Wright, 135 F. 947 (8th Cir. 1905), appeal dismissed without opinion, 203 U.S. 599, 27 S.Ct. 777, 51 L.Ed. 334 (1906); Maxey v. Wright, 105 F. 1003 (8th Cir.), aff'g 3 Ind.T. 243, 54 S.W. 807 (1900); Crabtree v. Madden, 54 F. 426 (8th Cir. 1893). The Attorney General of the United States also approved similar taxes. E. g., Cherokee Indians Export Tax on Hay, 23 Op.Att'y Gen. 528 (1901); Choctaw and Chickasaw Permit Laws, 18 Op.Att'y Gen. 34 (1884).
 
 
 30
 The parties to this appeal forcefully dispute the characterization of these decisions the Tribe argues these decisions involved the inherent power to tax; the lessees argue they merely support the proposition that tribes have the proprietary, but not sovereign, right to exact fees from persons desiring to enter the reservation and do business therein. From our reading of the cases and opinions, we conclude that the decisions were grounded upon tribal sovereignty, with the exception of Choctaw and Chickasaw Permit Laws, 18 Op.Att'y Gen. 34 (1884). But two different sovereign powers have been relied upon the power to tax, e. g., Cherokee Indians Export Tax on Hay, 23 Op.Att'y Gen. 528 (1901), or the power to exclude nonmembers from the reservation and set the terms upon which such persons could enter and do business therein. E. g., Buster v. Wright, 135 F. at 950. The Supreme Court in Morris v. Hitchcock appears to have recognized both theories. 194 U.S. at 389-93, 24 S.Ct. at 713-15.
 
 
 31
 The case before us presents the bald issue of an Indian tribe's taxing power without benefit of reservations of authority in a treaty. Thus, it seems important to ascertain whether particular treaties influenced the decisions discussed above. Although the United States did not always require tribes to give up the power to exercise civil jurisdiction over nonmembers and their property within the reservation, see, e. g., Jurisdiction of the Courts of the Choctaw Nation, 7 Op.Att'y Gen. 174, 176 (1855), nearly all of these tribes had done so. See, e. g., Morris v. Hitchcock, 21 App.D.C. 565, 593 (1903), aff'd, 194 U.S. 384, 24 S.Ct. 712, 48 L.Ed. 1030 (1904). Yet throughout the decisions is the sometimes explicit and sometimes implicit assumption that tribal exercise of power over nonmembers doing business on the reservation in connection with that business did not offend the interests of the United States and was a sovereign right retained by the tribes. Two cases decided by the Eighth Circuit after passage of the Act expressly upholding tribal taxes on the theory of the power of taxation share this assumption. Barta v. Oglala Sioux Tribe, 259 F.2d 553 (8th Cir. 1958), cert. denied, 358 U.S. 932, 79 S.Ct. 320, 3 L.Ed.2d 304 (1959); Iron Crow v. Oglala Sioux Tribe, 231 F.2d 89 (8th Cir. 1956).
 
 
 32
 Congress also apparently recognized tribal power to tax nonmembers within the reservation when it passed section 16 of the Act, which confirmed the existence of sovereign tribal powers generally. In hearings conducted prior to passage of the Act, Congress was apprised of the holding of Buster v. Wright, 135 F. 947 (8th Cir. 1905). See To Grant To Indians Living Under Federal Tutelage The Freedom To Organize For Purposes of Local Self-Government and Economic Enterprise: Hearings on S. 2755 and S. 3645 Before The Senate Comm. on Indian Affairs, 73d Cong., 2d Sess. 269-70 (1934). Solicitor Margold of the Department of Interior, in an opinion, considered the intent of Congress in its reference in section 16, to "all powers vested in any Indian tribe or tribal council by existing law." Among those retained powers, he concluded that
 
 
 33
 (c)hief among the powers of sovereignty recognized as pertaining to an Indian Tribe is the power of taxation. Except where Congress has provided otherwise, this power may be exercised over members of the tribe and over nonmembers, so far as such nonmembers may accept privileges of trade, residence, etc., to which taxes may be attached as conditions.
 
 
 34
 Powers of Indian Tribes, 55 Interior Dec. 14, 46 (1934). This opinion, virtually contemporaneous with the Act, is persuasive evidence that neither Congress nor the Department of Interior believed a tribal taxing power would conflict with the interests of the United States. See also United States Department of the Interior, Federal Indian Law 435-39 (1958); 1 Final Report of the American Indian Policy Review Comm'n 154-58, 178-82 (1977). Consistent with its interpretation of the Act, the Department approved the tax involved in this case. As the agency charged with construction of the Act in the course of its actual execution, the Department's conclusion that Indian tribes retain the power to levy a tax of the type involved here deserves great respect. See Northern Cheyenne Tribe v. Hollowbreast, 425 U.S. 649, 660, 96 S.Ct. 1793, 1799, 48 L.Ed.2d 274 (1976).
 
 
 35
 Except for the dollar sums involved, which are irrelevant, see City of Pittsburgh v. Alco Parking Corp., 417 U.S. 369, 94 S.Ct. 2291, 41 L.Ed.2d 132 (1974), we see no essential difference between the privilege taxes here levied and those approved by the Supreme Court in Morris v. Hitchcock and in the Eighth Circuit cases cited above. For all the reasons discussed above, we conclude that the Tribe has the inherent power to levy a privilege tax on the occupation of severing oil and gas from reservation land even though the tax falls on nonmembers.
 
 III
 
 36
 We now consider the argument that the severance tax violates the Commerce Clause. The Constitution empowers Congress to "regulate Commerce with foreign Nations, and among the several states, and with the Indian Tribes." U.S.Const. art. I, § 8, cl. 3. We believe the national interest manifested in the Commerce Clause is not sufficient to preclude the tribes' power to tax, but this clause of its own force limits the power of the tribes as well as the states. See Boston Stock Exch. v. State Tax Comm'n, 429 U.S. 318, 328, 97 S.Ct. 599, 606, 50 L.Ed.2d 514 (1977). It has long been established that the tribes constitute a separate category within that clause. The Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1, 18-19, 8 L.Ed. 25 (1831). Since the tribes are not "states," see id. at 16, United States v. Wheeler, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978), and necessarily are located within the boundaries of one or more states, they are not subject directly to those doctrines implementing the phrase "among the states."
 
 
 37
 It appears that no court has analyzed how the tribes are limited in their taxing power by the Indian Commerce Clause. We hold the standard to be used in applying that clause is whether a tribe's tax legislation infringes upon the national interest in maintaining the free flow of interstate trade. Our view is that this national interest is measured by traditional analyses. The trial court found the tax imposed by the Tribe both discriminates against interstate commerce and constitutes a multiple burden on commerce. We treat first the discrimination question.
 
 
 38
 The trial court's stated reason for holding the tax discriminates against interstate commerce is that the tax "is levied only against natural gas, crude oil or condensate which is produced on the reservation and sold or transported off the reservation." This reason, which simply tracks the language of the ordinance, can be interpreted in two ways.
 
 
 39
 The first interpretation is that the tax provides "a direct commercial advantage to local business." Boston Stock Exch. v. State Tax Comm'n, 429 U.S. 318, 329, 97 S.Ct. 599, 607, 50 L.Ed.2d 514 (1977) (quoting Northwestern States Portland Cement Co. v. Minnesota, 358 U.S. 450, 458, 79 S.Ct. 357, 362, 3 L.Ed.2d 421 (1959)). Although there actually is no Indian production here, the ordinance by its terms would apply to any operator engaged in severing the subject resources within the reservation. Apparently, the trial court viewed the provision exempting "(r)oyalty gas, oil or condensate taken by the Tribe in kind, and used by the Tribe" as the requisite local preference. We disagree. Subjecting royalty products the Tribe would receive to its own tax would be a fruitless and wasteful act. We therefore think the exemption is permissible.
 
 
 40
 Second, in view of the trial court's finding that eighty percent of the hydrocarbons produced on the reservation entered interstate commerce, which we accept as true for purposes of this appeal, the court's conclusion of law can mean it believed the tax is to be levied on the privilege of engaging in interstate commerce itself. Were this correct, the standards of Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 279, 97 S.Ct. 1076, 1079, 51 L.Ed.2d 326 (1977), and Department of Rev. v. Association of Wash. Stevedoring Cos., 435 U.S. 734, 98 S.Ct. 1388, 55 L.Ed.2d 682 (1978), would be applicable.[4] However, it is settled that an occupation or privilege tax on the mining or severing of natural resources, although closely connected with interstate commerce, is a local activity properly subject to local taxation. Oliver Iron Mining Co. v. Lord, 262 U.S. 172, 43 S.Ct. 526, 67 L.Ed. 929 (1923). See Dunbar-Stanley Studios, Inc. v. Alabama, 383 U.S. 537, 541, 89 S.Ct. 757, 760, 21 L.Ed.2d 759 (1969); Alaska v. Arctic Maid, 366 U.S. 199, 81 S.Ct. 929, 6 L.Ed.2d 227 (1961); Hope Natural Gas Co. v. Hall, 274 U.S. 284, 47 S.Ct. 639, 71 L.Ed. 1049 (1927). This is true even though the severed product is destined for immediate entry into interstate commerce, Arctic Maid, 366 U.S. at 204, 81 S.Ct. at 932; Oliver Iron Mining Co., 262 U.S. at 177-78, 43 S.Ct. at 529, and even though the cost of interstate commerce is increased. Coverdale v. Arkansas-Louisiana Pipe Line Co., 303 U.S. 604, 612, 58 S.Ct. 736, 740, 82 L.Ed. 1043 (1938). See Complete Auto Transit, Inc. v. Brady, 430 U.S. 274, 288, 97 S.Ct. 1076, 1083, 51 L.Ed.2d 326 (1977). The Tribe's tax fits within this line of cases.
 
 
 41
 The clear thrust of the ordinance is that the taxable event is severance or bringing the resources to the surface. To be sure, the ordinance's phrase "severed, saved and removed from Tribal lands" is ambiguous, for the taxable event could be removal from the territorial boundaries of the reservation after severance. But we think the phrase "remove from Tribal lands" merely means removal from the soil, as the Tribe argues. This interpretation is reinforced by the explicit requirement that the taxes are due at the time of severance. Nor does the provision that the tax rate is to be applied to oil or gas "sold or transported off the Reservation," alter this conclusion. Although this phrase is also ambiguous, it would seem to mean the tax rate is applied to natural gas and oil that is sold on the reservation or transported off the reservation before sale. The only products not included in the tax computation are those used by the operators in the process of production and those received by the Tribe as royalty in kind. All other products are taxed at the time of severance.
 
 
 42
 The trial court also held the tax invalid as a multiple burden on interstate commerce, apparently because New Mexico imposes an oil and gas severance tax, as well as an oil and gas emergency school tax, an oil and gas conservation tax, and an oil and gas production equipment ad valorem tax. See N.M.Stat.Ann. §§ 7-29-1 to 7-29-22; id. §§ 7-31-1 to 7-31-25; id. §§ 7-30-1 to 7-30-26; id. §§ 7-34-1 to 7-34-20 (1978). The Supreme Court, in Western Live Stock v. Bureau, 303 U.S. 250, 58 S.Ct. 546, 82 L.Ed. 823 (1938), explained the basis for finding this type of violation of the Commerce Clause as follows:
 
 
 43
 The vice characteristic of (local taxes) which have been held invalid is that they have placed on the commerce burdens of such a nature as to be capable, in point of substance, of being imposed . . . or added to . . . with equal right by every state which the commerce touches, merely because interstate commerce is being done, so that without the protection of the commerce clause it would bear cumulative burdens not imposed on local commerce.
 
 
 44
 Id. at 255-56, 58 S.Ct. at 548-49 (citations omitted) (emphasis added). Applying this analysis, we hold the trial court erred.
 
 
 45
 We first note that the focus is upon the type of tax that every state may impose with equal right. It is beyond question that no state, with the exception of New Mexico, has a sufficient connection with the occupation of severing oil and natural gas within the reservation to support levy of a severance tax on lessees' occupation. There is thus no threat of a multiple burden emanating from this tax unless the possibility, which we assume is fact, of New Mexico levying an identical tax constitutes a multiple burden within the meaning of the Commerce Clause. That New Mexico may be able to impose an identical tax on lessees does not implicate the federal interest in maintaining the flow of interstate commerce at all, we believe. Rather it raises two different questions whether the state's tax interferes with the federal interest in regulating the affairs of the Indians, a question we do not reach, and whether a Congressional grant of authority to levy the state tax preempts tribal taxation, addressed in Part IV, infra.
 
 
 46
 We hold the federal interest in interstate commerce, manifested in traditional Commerce Clause analyses, does not limit the Tribe's power to impose this tax.
 
 IV
 
 47
 We next consider whether Congress has preempted the exercise of the Tribe's power to levy the severance tax. The trial court held that by granting to the states the right to tax the production of oil and gas on executive order reservations, Congress intended to preempt similar tribal taxation. The basis of this ruling is 25 U.S.C. § 398c, which provides:
 
 
 48
 Taxes may be levied and collected by the State or local authority upon improvements, output of mines or oil and gas wells, or other rights, property, or assets of any lessee upon lands within Executive order Indian reservations in the same manner as such taxes are otherwise levied and collected, and such taxes may be levied against the share obtained for the Indians as bonuses, rentals, and royalties, and the Secretary of the Interior is hereby authorized and directed to cause such taxes to be paid out of the tribal funds in the Treasury: Provided, That such taxes shall not become a lien or charge of any kind against the land or other property of such Indians.
 
 
 49
 (Emphasis in original). Section 398c was an integral element of the Act of March 3, 1927, ch. 299, 44 Stat. 1347, which also settled then unresolved questions concerning the status of Indian mineral rights in executive order reservation lands and granted to the Indians all the royalty, rental and bonus income from oil and gas leases on their reservations. See id. § 2, 44 Stat. 1347 (codified at 25 U.S.C. § 398b). See also Sen.Rep.No.768, 69th Cong., 1st Sess. (1926); H.R.Rep.No.763, 69th Cong., 1st Sess. (1926).
 
 
 50
 In construing this statute, we must apply the
 
 
 51
 "eminently sound and vital canon," Northern Cheyenne Tribe v. Hollowbreast, 425 U.S. 649, 655 n. 7 (, 96 S.Ct. 1793, 1797, 48 L.Ed.2d 274) (1976), that "statutes passed for the benefit of dependent Indian tribes . . . are to be liberally construed, doubtful expressions being resolved in favor of the Indians." Alaska Pacific Fisheries v. United States, 248 U.S. 78, 89 (, 39 S.Ct. 40, 42, 63 L.Ed. 138) (1918). See Choate v. Trapp, 224 U.S. 665, 675 (, 32 S.Ct. 565, 569, 56 L.Ed. 941) (1912); Antoine v. Washington, 420 U.S. 194, 199-200 (, 95 S.Ct. 944, 948-949, 43 L.Ed.2d 129) (1975).
 
 
 52
 Bryan v. Itasca County, 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976). Fairly read, this statute does not by its terms preclude tribal taxation of lessees engaged in the business of producing oil and gas from within executive order reservations. Moreover, the legislative history, which reflects Congress's awareness of the need at that time for express authorization of state taxation of Indians and of non-Indians doing business with Indians on the reservation, does not show an express or implied intent to preempt tribal taxation. See H.R.Rep.No.1791, 69th Cong., 2d Sess. 4 (1927); Sen.Rep.No.768, 69th Cong., 1st Sess. (1926); H.R.Rep.No.763, 69th Cong., 1st Sess. (1926); 68 Cong.Rec. 4569-81 (1927); 67 Cong.Rec. 10912-25 (1926); 66 Cong.Rec. 2233-34 (1925); 66 Cong.Rec. 998-99 (1924).
 
 
 53
 A careful reading of the legislative history convinces us that Congress simply did not think of the issue when it enacted the statute, even though the Supreme Court and the Eighth Circuit had approved tribal taxation of nonmembers under similar circumstances. See Part II, supra. There was dispute over whether the Indians should receive all of the royalty income from leases of reservation lands. Legislators who opposed the Act as too generous might well have voted against giving the Indian tribes power to levy taxes, but the majority, who obviously thought that all benefits from the minerals on the reservations belonged to the Indians, might well have voted the other way. At no time when the state taxes were mentioned was there any discussion that the amount of such taxes might be relevant to passage of the Act. We therefore conclude that section 398c, being part of an act passed to benefit the Indians and ambiguous in letter and intent with respect to tribal taxation, does not preempt the tribal tax ordinance at issue in this case.[5]
 
 
 54
 It also may be argued that by virtue of its regulation of the leasing process, Congress preempted independent tribal taxation of those acquiring leases by that process. Cf. Warren Trading Post v. Arizona Tax Comm'n, 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965) (all-inclusive federal regulations and statutes applicable to trading on the reservations with Indians preempt state taxation of traders doing business thereunder). In essence, the argument is that by prescribing the procedures for the acquisition of leases and determining the royalty, bonus and rental payments the Indians are to receive, Congress intended that no burdens other than those embodied in the leases be imposed on the lessees.
 
 
 55
 When Congress first authorized leasing of land within executive order reservations for oil and gas purposes in the Act of March 3, 1927, ch. 299, § 1, 44 Stat. 1347 (codified at 25 U.S.C. § 398a), it provided that the same rules apply as for leasing oil and gas interests on other types of reservations. See 25 U.S.C. §§ 397, 398. Thus, the Secretary of the Interior, with the consent of the tribal council, was charged with the responsibility of conducting a public auction to obtain the best terms possible for the Indians. See 25 U.S.C. § 398. But in 1938 Congress effected a change in this scheme that is significant for our purposes. The General Leasing Act of 1938, ch. 198, 52 Stat. 347 (codified at 25 U.S.C. §§ 396a-396g), intended to make uniform the various laws applicable to the leasing of Indian lands for mining purposes and to conform the laws to the purposes of the Indian Reorganization Act of 1934, §§ 16, 17, 25 U.S.C. §§ 476, 477. See H.R.Rep.No.1872, 75th Cong., 3d Sess. (1938). Therefore, it elaborated on the procedures to be followed for leasing oil and gas interests. But of greater significance is the proviso found in that section, which allows tribes organized and incorporated under 25 U.S.C. §§ 476, 477 to assume and define for themselves the leasing process.[6]
 
 
 56
 Thus, Congress expressly provided that tribes like the Jicarilla Apache Tribe may, by proper constitutional and legislative means approved by the Secretary of the Interior, see 25 U.S.C. § 476, determine the terms upon which they will lease their lands and regulate the operations of their lessees.[7] Under these circumstances we cannot conclude that Congress intended to so occupy the field of regulating leasing of tribal property for oil and gas leases that the Tribes could not impose additional burdens on lessees through exercise of the power of taxation.
 
 
 57
 The leases themselves contain a provision that no change may be made in the rate of "royalty or annual rental" without written consent of the parties to the lease. But as lessees acknowledged at oral argument, such a provision does not preclude a sovereign that is also a lessor from imposing a tax which has the practical effect of increasing its revenues. It is well settled that such an agreement does not prevent the exaction of a license tax "unless this right has been specifically surrendered in terms which admit of no other reasonable interpretation." City of St. Louis v. United Rys. Co., 210 U.S. 266, 280, 28 S.Ct. 630, 634, 52 L.Ed. 1054 (1908). See also New Orleans City & Lake R. R. v. City of New Orleans, 143 U.S. 192, 12 S.Ct. 406, 36 L.Ed. 121 (1892).
 
 
 58
 We have considered the remaining contentions of the parties and do not find them to be dispositive.
 
 
 59
 The judgment of the trial court is reversed and remanded with direction to enter judgment in favor of appellants.
 
 McKAY, Circuit Judge, concurring:
 
 60
 While I concur fully in the opinion of the court, I file this statement to emphasize certain considerations dictating the result reached.
 
 
 61
 As the dissenting opinion of the Chief Judge suggests, the time in history at which one begins his analysis certainly does affect the outcome. For the most complete examination, we should begin in pristine times, or at the very latest with 1788 and the ratification of our fundamental law. At that moment there were at least four, not three, entities recognized by the Constitution. There was, of course, the federal government. There were, of course, the states. There were, of course, foreign nations. And there were "the Indian Tribes."[1]
 
 
 62
 Beginning with the ratification of the Constitution, it is essential to examine both the actual dealings with the tribes and the language employed in those dealings in order to comprehend the tribes' special status. Even the conquering government characterized them as "nations." The early Supreme Court decisions incorporate those national concepts as, for instance, in Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832), where Chief Justice Marshall wrote: "(A) weaker power does not surrender its independence its right to self government, by associating with a stronger and taking its protection." Id. at 561. Both the language and formality of treaties were employed in defining the tribes' special status. Indeed, "(t)he Indian tribes were recognized as powers capable of making treaties before the United States was." F. Cohen, Handbook of Federal Indian Law 274 (1942).
 
 
 63
 The source of cession of Indian lands is of relatively little consequence. Whether the lands came from the exaggerated claims of dominion asserted by France, Spain, Russia or Mexico, our government continued to treat the Indian tribes with the same essential assumptions. For example, the President negotiated and the Senate ratified a treaty with the Mescalero Apaches a nation of Indians living within the land ceded by Mexico only four years after the Treaty of Guadalupe Hidalgo. See Treaty with the Apaches, July 1, 1852, 10 Stat. 979 (1852). In no sense, then, were all vestiges of governmental power abolished in the New Mexico tribes. Thus, we see that the Indians were never treated as mere corporations, mere landholders or mere associations. While it is true that Congress did not formally ratify the proposed treaty with the Jicarilla, that fact does not derogate from the general underlying assumptions about the tribe's historic status. A congressional failure to ratify a treaty does not convert a "nation" into a voluntary association. The profile of the tribe's rights, practices and relationships under federal authority properly reflects a status similar to the tribes whose proposed treaties were indeed ratified. "Executive order reservations have exactly the same validity and status as any other type of reservation." F. Cohen, Handbook of Federal Indian Law 299 (1942) (citing 34 Op. Att'y Gen. 181, 186-89 (1924)).
 
 
 64
 Tribes have characteristics of sovereignty not enjoyed by the kinds of proprietary and fraternal bodies which the Chief Judge asserts are most analogous to the tribes. If we were to deny the importance of sovereignty in our analysis, we would be ignoring the clear dictates of the Supreme Court. See, e. g., Santa Clara Pueblo v. Martinez, 436 U.S. 49, 56, 98 S.Ct. 1670, 1676, 56 L.Ed.2d 106 (1978); McClanahan v. Arizona State Tax Commission, 411 U.S. 164, 172, 93 S.Ct. 1257, 1262, 36 L.Ed.2d 129 (1973). Indeed, the Court has consistently held the tribes to have the "common-law immunity from suit traditionally enjoyed by sovereign powers." Santa Clara Pueblo v. Martinez, 436 U.S. at 58, 98 S.Ct. at 1677.
 
 
 65
 Indian "self-determination" is not in substance the same as that of any voluntary association. Congress has explicitly "recognize(d) the obligation of the United States to respond to the strong expression of the Indian people for self-determination." 25 U.S.C. § 450a(a) (1976). And the principle of self-determination may be said to require protection of territoriality. See McCoy, The Doctrine of Tribal Sovereignty: Accommodating Tribal, State, and Federal Interests, 13 Harv.C.R.-C.L.L.Rev. 357, 390 & 390 n.154 (1978).
 
 
 66
 Even though Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978), shies away from the prospect of non-Indians answering to Indian tribunals for criminal behavior, it nonetheless confirms that tribes enjoy sovereign powers not remotely granted to corporations, voluntary associations, and the like. Id. at 208, 98 S.Ct. at 1020. Those powers may be subject to divestiture by the superior federal power, but such divestiture is implied only if the powers are inconsistent with the tribes' status. Id. In a limited area, Oliphant found divestiture, but "(i)n most respects the Oliphant Court's rationale does not apply to noncriminal cases." Collins, Implied Limitations on the Jurisdiction of Indian Tribes, 54 Wash.L.Rev. 479, 508 (1979). Tribes clearly do have governmental authority over nonmembers in many instances. For example, "(t)ribal courts have repeatedly been recognized as appropriate forums for the exclusive adjudication of disputes affecting important personal and property interests of both Indians and non-Indians." Santa Clara Pueblo v. Martinez, 436 U.S. at 65, 98 S.Ct. at 1681. See United States v. Mazurie, 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975); Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959).
 
 
 67
 The reservation tribes, including the Jicarilla, typically and with congressional approval have operated as governments. There can be no doubt that the federal government, because of the special authority granted it in dealing with the Indians, has the power either to confirm in them or to grant to them typical municipal powers whether they be police powers, regulatory powers or fiscal powers. It simply does not make sense to expect the tribes to carry out municipal functions approved and mandated by Congress without being able to exercise at least minimal taxing powers, whether they take the form of real estate taxes, leasehold taxes or severance taxes. Such taxes certainly do not offend the concerns expressed in Oliphant because historically and conceptually these taxes are associated with land, even though the impact may ultimately fall on individuals, Indian or non-Indian.
 
 
 68
 Finally, because the case is so often cited, I think it important to emphasize that Puyallup Tribe, Inc. v. Department of Game, 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977), provides no authority whatsoever for the State of New Mexico to assert jurisdiction over Indian reservations. The Chief Judge correctly notes that the case upheld the right of the State of Washington to regulate the netting of steelheads by individual Puyallup Indians. However, unlike New Mexico, Washington had explicitly asserted Public Law 280 "civil and criminal jurisdiction within the (Puyallup) reservation for most purposes." Id. at 175, 175 n.14, 97 S.Ct. at 2622, n. 14. In addition, in contrast to the Jicarilla reservation, the Puyallup reservation has ceased to exist for all practical purposes. The Puyallups have alienated all but 22 acres of their 18,000 acre reservation, and none of the remaining 22 acres abuts on the river in question. Id. at 174, 97 S.Ct. at 2622. Furthermore, although the Jicarilla Apaches have not done so, a tribe may voluntarily relinquish some of its jurisdictional rights. In Puyallup Tribe, the Court interpreted the relevant treaty as permitting state regulation. Id. at 175, 97 S.Ct. at 2622.
 
 SETH, Chief Judge, dissenting:
 
 69
 I must dissent from the majority opinion for several reasons.
 
 
 70
 I would begin the analysis of the issues presented in this appeal at a very early date to place the matter in its historical context. Thus, in my view, the consideration of this appeal should not start with an analysis of "sovereignty," as the Secretary urges, as this includes too many assumptions and generalizations which are questionable but which nevertheless influence the outcome. As so often happens when a start is made too far along the sequence of events or the development of doctrines the selection of a place to start determines where the writer is going to come out. Thus I would start instead with an examination of the fundamental relationships as they existed initially between the federal government and the Jicarilla Apaches, and this relationship as influenced by the creation of the State of New Mexico.
 
 
 71
 The Jicarilla Apaches were then and now are in the area ceded to the United States after the war with Mexico. The Treaty of Guadalupe Hidalgo with Mexico in 1848 (9 Stat. 922) contained provisions for the recognition of land titles, and the proprietary interests of the citizens of Mexico within the area ceded. No separate mention is therein made of Indian lands or any recognition given to Indian groups other than border problems. These groups had been under the rule of Spain and of Mexico for two hundred years. They were in an area settled by Spain and Mexico and in frequent contact over the years. The Pueblo Indians had received grants of land as had non-Indian groups. The Treaty treats all persons within the ceded area in the same way. The Treaty of Guadalupe Hidalgo thus spoke for all persons within the geographical area concerned, as would any treaty. There was no separate treatment of particular areas or groups and there was no reason why there should have been. All persons had been subjects of the Spanish crown and the government of Mexico for several hundred years. The sovereignty was thus transferred from the government of Mexico to the United States. This was not an area being occupied by the first foreign sovereign to come on the scene wherein it would be expected that the various groups of inhabitants would be dealt with separately or differently. Instead it was the conclusion of a war between two nations one of which, with its predecessor, had exercised complete authority and sovereignty over the land and all the people for several hundred years. With the end of the war and the peace treaty all the persons in the ceded area who stayed automatically came under the complete authority of the United States. They were thereby transferred from one sovereign to another. The citizenship issues have been treated by a number of authorities and need not be considered here because there is no question as to the complete authority of the new sovereign over all the people as a consequence of the Treaty with Mexico and the position as a successor.
 
 
 72
 At the end of the Spanish occupation there were in New Mexico and Arizona some six or eight independent Apache tribes. One of these was the Jicarilla Apaches. In 1846 after the period of Mexican sovereignty the Jicarillas numbered about 500 according to Governor Bent. There were then in all ten to twelve groups, each consisting of eight to ten family units, with a total of about forty-five individuals. Albert H. Schroeder, Apache Indians I (Garland Publishing Co. reprints, reports and exhibits) (hereinafter cited as Schroeder). The basic unit was the family group. There were no clans or gentes. M. E. Opler, referring to the Jicarillas (as quoted by Schroeder), writes:
 
 
 73
 "The Tribe was a rather nebulous entity of its members. The band was a man's immediate concern.
 
 
 74
 "They were semi-nomads, following wild food harvests.
 
 
 75
 "The people living in one section of the tribal range would seldom meet their tribesmen of a more distant quarter."
 
 
 76
 Opler also writes that the local groups would form a loose confederation for social purposes, and for defense or aggression. When the small units banded together for war a leader was accepted by agreement, but each individual was free to come or go at will or reject the leader (Shroeder). As early as 1796 Colonel Don Antonio Cordero, as to all Apaches, reported (per Schroeder): "At present they do not compose one nation of uniform customs, usages and tastes." There was, of course, no central authority for the Jicarillas at any time. Each autonomous group would winter around their geographic landmark near the Sangre de Cristo Mountains, and in summer move about with the availability of food, and move eastward to hunt buffalo. These groups used an area of some 5,000 to 7,000 square miles. See generally H.R.Rep.No.2503 (1953). There was thus self-determination within the socio-religious-family relationships. This went with the small groups wherever they went as it had no geographical significance nor relationship to any other group. There were several small groups who farmed near Taos and Cimarron. For descriptive purposes the Spanish referred separately to the eastern groups, the Sand group, and the more western group. An eastern group leader was dealt with for a time in the pre-American period.
 
 
 77
 The Treaty of Guadalupe Hidalgo and the American occupation necessarily displaced all existing authority in the area, and there were then created the only governmental entities in New Mexico which were to exist during the interim period. Thus a new government came on the scene to supplant entirely the old. This was not an unfamiliar event in the history of the world.
 
 
 78
 Thus with the substitution of the government of the United States for the government of Mexico all the individuals in the area started anew with only their property. Thus there is nothing to build on in New Mexico to create a concept of sovereign power in any group remaining from Spanish or Mexican times. The start is from a zero base with the American occupation for all persons in the area. This new structure was established by the code promulgated by General Kearney in September of 1846. It was a complete code of laws and created the framework of the government with many details. Thus there were no vestiges preserved of any governmental powers whatever in the Indian groups in New Mexico who did not occupy pueblos. The Jicarilla Apaches had no such powers over others, and if they had any they would have been lost by the American occupation.
 
 
 79
 The act organizing the territory of New Mexico was effective in September of 1850 (9 Stat. 446). This was a skeleton of organization and contained no mention of land ownership nor of the Indians. This was followed by the Enabling Act for the State of New Mexico (36 Stat. 557, Act of June 10, 1910). This Act contains the first reference to the Indians as a group. This Act recognized them only as landowners or possible landowners. The Act as to non-Indians provides in part that "people inhabiting said proposed state" disclaim all proprietary claims to the lands of the United States and of the Indians. The Act also acknowledges the exclusive jurisdiction in Congress over Indian lands. This disclaimer is by the "people" and only of proprietary interests. It has nothing to do with a disclaimer of sovereign power of the state, and again relates only to lands in an attempt to retain the status quo, and the rights under the Treaty of Guadalupe Hidalgo.
 
 
 80
 The Enabling Act, of course, contemplated the creation of a state under the United States Constitution with the vesting of broad powers in the new state. The Constitution contemplates that the states are to create within their boundaries the counties, parishes, cities and villages. The states thus establish all the local bodies and all entities having governmental powers within their boundaries. The federal government under its residual powers retained no authority to create governmental bodies within the states. The state-created entities are the ones in which the opportunity for participation extended to all persons within the boundaries. These are the foundation of governmental authority as it exists in the United States. Not only are there no federally created governmental entities within the states provided for by the Constitution, but it also does not contemplate the existence of other "nations" within the boundaries of the United States. Obviously there is no place for them in the governmental structure therein created.
 
 
 81
 It is significant in this respect that the Court in Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209, quoted from United States v. Kagama, 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 the following:
 
 
 82
 " 'Indians are within the geographical limits of the United States. The soil and people within these limits are under the political control of the Government of the United States, or of the States of the Union. There exist in the broad domain of sovereignty but these two. There may be cities, counties, and other organized bodies with limited legislative functions, but they . . . exist in subordination to one or the other of these.' "
 
 
 83
 As to the Jicarillas, long after the American occupation legislation began to fill the vacuum as to their internal matters, their relation with the federal government and New Mexico, their money, and their tribal businesses, but all within Constitutional limitations. The place or location in New Mexico to be occupied by the Jicarillas after the American occupation changed several times. There were a series of executive orders promulgated and revoked. Finally, a location was established and the Executive Order recites that a described tract is "set apart as a reservation for the use and occupation of the Jicarilla Apache Indians." This is obviously something other than "ownership" but for our purposes it is no different from any other real estate "owned" by an individual or a group. It is no different from the Spanish and Mexican community land grants existing and recognized in New Mexico from the earliest times. These grants are also managed, used, and owned by groups in a community. The combination of land ownership and self-determination for anyone does not add up to anything more than the elements separately considered. The combination does not create a governmental agency or entity recognized or contemplated by the Constitutions of the United States or of New Mexico.
 
 
 84
 The sovereignty argument advanced by the Secretary must lose significance for purposes under consideration because non-members of the tribe (including Indian non-members) are excluded from participation. This is an express exclusion based solely on tribal membership. Perhaps this is as it should be for self-determination; however, such a group of tribal members excluding all others cannot exert governmental authority over those excluded. It is obvious that our whole governmental structure is based on representation with an opportunity to participate. When this is provided authority exists to govern. Here we cannot add the exclusive group self-determination to land ownership and come out, as to the outsiders, with anything more than the rights of a private landowner. "Self-determination" for such an exclusive group is in substance what any socio-religious group has in this country, and should have. If such group owns a tract of land, there is the same combination of self-determination and private property which again adds up to private property as to non-members. This is typical of community land grants in New Mexico. The added element as to the Jicarillas is the control by Congress and the limited land "ownership." These for all practical purposes must be negative elements.
 
 
 85
 The plenary power of Congress over the Indians and their lands is obvious, but it must be recognized as a power "over the Indians" and not a power over non-Indians. The power of Congress over the Indians and their lands cannot include the exercise of such power to diminish the rights of non-Indians. To do so is to exercise plenary power over non-Indians. Thus Congress cannot under the Constitution add sufficient elements or powers to such an exclusive tribal group any more than it can to any other socio-religious group which would enable the members to exercise governmental powers of any nature in New Mexico.
 
 
 86
 The Secretary here urges that the Reorganization Act added some new ingredient of a governmental nature. Under the Constitution Congress cannot add new governmental entities in New Mexico not theretofore provided for. The federal government cannot by the Reorganization Act or by any other method introduce "nations" or governmental entities within the state. The Reorganization Act is an aspect of the current policy of the federal government seeking to cast self-determination machinery in a form in which it is accustomed to, and which has a "governmental" appearance. The whole concept of self-determination should be taking place and should have been advanced in years past. All must agree that it is most desirable, and to be valid it must be recognized for what it really is "self-determination."
 
 
 87
 It is a mistake to generalize about "Indian rights," wherever the groups may be in the United States, and to disregard the events in their history, in the history of the states where they may now be located, and the events and sequence of such events in the history of the United States. The differences are too great to permit the broad generalizations which are urged on this appeal by the Government or the basic assumptions made therein.
 
 
 88
 The State of New Mexico under specific federal statutes and under its sovereign powers has extensive jurisdiction within Indian reservations which it may choose to exercise or not to do so. The Supreme Court in Puyallup Tribe v. Washington Game Dept., 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667, considered and upheld the right of Washington State to control the netting of steelheads by individual Indians within the Puyallup Tribe's reservation. See also Kake Village v. Egan, 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573.
 
 
 89
 The Court in Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209, referred to the many instances where the Court has referred to the limited authority retained by Indian tribes. The Court therein refers to the "quasi-sovereign" reference in The Cherokee Nation v. Georgia, 5 Pet. 1, 8 L.Ed. 25, and then states:
 
 
 90
 "But the tribes' retained powers are not such that they are limited only by specific restrictions in treaties or congressional enactments. As the Court of Appeals recognized, Indian tribes are prohibited from exercising both those powers of autonomous states that are expressly terminated by Congress and those powers 'inconsistent with their status.' " (Emphasis supplied.)
 
 
 91
 The Court also refers therein to Johnson v. M'Intosh, 8 Wheat. 543, 5 L.Ed. 681, and stated that:
 
 
 92
 "We have already described some of the inherent limitations on tribal powers that stem from their incorporation into the United States."
 
 The Court continued:
 
 93
 "Nor are the intrinsic limitations on Indian tribal authority restricted to limitations on the tribes' power to transfer lands or exercise external political sovereignty. In the first case to reach this Court dealing with the status of Indian tribes, Mr. Justice Johnson in a separate concurrence summarized the nature of the limitations inherently flowing from the overriding sovereignty of the United States as follows: '(T)he restrictions upon the right of soil in the Indians, amount . . . to an exclusion of all competitors (to the United States) from their markets; and the limitation upon their sovereignty amounts to the right of governing every person within their limits except themselves.' " (Emphasis supplied.)
 
 
 94
 Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209, is a significant decision by the Supreme Court. It is, of course, directly concerned with the authority of an Indian tribe to exercise criminal authority over a nonmember. The decision, however, carries a parallel analysis and statement of reasons applicable to jurisdiction or power by the Indians over all matters relating to nonmembers. We have above referred to portions of the opinion and the references to other Supreme Court opinions therein contained. The decision represents, together with United States v. Wheeler, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303, a description of Indian "sovereignty" after all its restrictions and limitations are applied, as authority over members of the tribe. This is "self-determination" as it now exists. The Court in Wheeler said:
 
 
 95
 "It is undisputed that Indian tribes have power to enforce their criminal laws against tribe members. Although physically within the territory of the United States and subject to ultimate federal control, they nonetheless remain 'a separate people, with the power of regulating their internal and social relations.' United States v. Kagama, supra, (118 U.S.) at 381-382 (, 6 S.Ct. at 1113); Cherokee Nation v. Georgia, 5 Pet. 1, 16 (, 8 L.Ed. 25)."
 
 
 96
 In a footnote to the above, the Court added:
 
 
 97
 "Thus, unless limited by treaty or statute, a tribe has the power to determine tribe membership, Cherokee Intermarriage Cases, 203 U.S. 76 (, 27 S.Ct. 29, 51 L.Ed. 96); Roff v. Burney, 168 U.S. 218, 222-223 (, 18 S.Ct. 60, 62, 42 L.Ed. 442); to regulate domestic relations among tribe members, Fisher v. District Court, 424 U.S. 382 (, 96 S.Ct. 943, 47 L.Ed.2d 106); cf. United States v. Quiver, 241 U.S. 602 (, 36 S.Ct. 699, 60 L.Ed. 1196); and to prescribe rules for the inheritance of property. Jones v. Meehan, 175 U.S. 1, 29 (, 20 S.Ct. 1, 12, 44 L.Ed. 49); United States ex rel. Mackey v. Coxe, 18 How. 100 (, 15 L.Ed. 299)."
 
 The Court in Wheeler continued:
 
 98
 "The sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance. But until Congress acts, the tribes retain their existing sovereign powers. In sum, Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status."
 
 And again:
 
 99
 "The areas in which such implicit divestiture of sovereignty has been held to have occurred are those involving the relations between an Indian tribe and nonmembers of the tribe."
 
 And again:
 
 100
 "These limitations rest on the fact that the dependent status of Indian tribes within our territorial jurisdiction is necessarily inconsistent with their freedom independently to determine their external relations. But the powers of self-government, including the power to prescribe and enforce internal criminal laws, are of a different type. They involve only the relations among members of a tribe. Thus, they are not such powers as would necessarily be lost by virtue of a tribe's dependent status. '(T)he settled doctrine of the law of nations is, that a weaker power does not surrender its independence its right to self government, by associating with a stronger, and taking its protection.' "
 
 
 101
 These quotations are especially significant when we consider the history of the Jicarillas, and the zero base from which they started into the American occupation. Even in United States v. Mazurie, 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706, the Court referred to the tribe there concerned as possessing "a certain degree of independent authority over matters that affect the internal and social relations of tribal life."
 
 
 102
 The two principal cases considered Oliphant and Wheeler of course, concerned criminal jurisdiction, but again the reasoning and analysis upon which the decisions are based is equally applicable to other "jurisdiction" or "powers" over nonmembers which would originate with any concepts of governmental status or an aspect of sovereignty. See also Puyallup Tribe v. Washington Game Dept., 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667. These several recent decisions, in my view, are determinative of the issue on appeal.
 
 
 103
 Thus under the most recent cases "Indian sovereignty," if it may be generalized, means self-determination. It means the right of the Jicarillas to control their internal business-governmental affairs relating to tribal members and, of course, their social and religious affairs. This is added to the usual rights which accompany the ownership of property both real and personal. These rights taken together do not include the taxation power here sought to be exercised. In contrast to the many license cases cited by the parties, if there is a license it is the executed oil and gas lease. The tribe is as any other landowner in relation to the lease for the purposes under consideration.
 
 
 104
 I would thus affirm the trial court.
 
 BARRETT, Circuit Judge, dissenting:
 I.
 
 105
 In Jicarilla Apache Tribe v. United States, 601 F.2d 1116 (10th Cir. 1979), we discussed the unique relationship between the United States Government and the Indian Tribes:
 
 
 106
 Since the year 1871, Indian tribes have been subject to the power and authority of the laws of the United States by means of the exercise of its legislative power over them. Prior thereto the various tribes were recognized by the United States as possessing the attributes of separate nations to the extent that treaties were entered into with them. Thus, since 1871 the Congress has regulated Indian affairs and the United States government serves as guardian of the Indian tribes, nations, or bands. Cherokee Nation v. Hitchcock, 187 U.S. 294, 23 S.Ct. 115, 47 L.Ed. 183 (1902). It has been said that, in a general way, the relationship now between the United States government and the Indian tribes is that of superior and inferior, in that the government has assumed, in large measure, the care and control of Indians and Indian Tribes. Montoya v. United States, 180 U.S. 261, 21 S.Ct. 358, 45 L.Ed. 521 (1901). The paradox, so to speak, is that even though Indian tribes have been held to have a (sovereign) status higher than the states they are nonetheless limited in sovereign power to the extent required of them by the superior sovereign, the United States. Native American Church v. Navajo Tribal Council, 272 F.2d 131 (10th Cir. 1959).
 
 
 107
 Congress possesses paramount power over the property of the Indians by reason of its exercise of guardianship over their interests. Thus, plenary authority over the tribal relations of Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one not subject to the control of the judicial branch of government. Lone Wolf v. Hitchcock, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903). The propriety or justification of action by the Federal Government, legislatively mandated, relative to Indian lands and properties is a political rather than a judicial question and that power is plenary. Oneida Indian Nation v. County of Oneida, (414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73) supra ; United States v. Santa Fe Pacific Railroad Co., 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941).
 
 
 108
 It is within the power of the Congress to provide that the laws of a state shall extend over and apply to Indian country and activities thereon, where they clearly do not interfere with federal policies concerning the lands. Warren Trading Post Co. v. Arizona Tax Commission, 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965); Organized Village of Kake v. Egan, 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962).
 
 
 109
 601 F.2d at pp. 1125, 1126.
 
 
 110
 In the exercise of the elusive concept of "tribal sovereignty", the courts have been able to readily define the limits thereof only if a federal statute or treaty speaks directly to the subject, i. e., the power of an Indian tribe to exercise a particular jurisdiction. Santa Clara Pueblo v. Martinez, 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978); Bryan v. Itasca County, Minnesota, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976). Thus, any general federal law fails if it conflicts with or abrogates a tribal treaty right. United States v. Winnebago Tribe of Nebraska, 542 F.2d 1002 (8th Cir. 1976). The two primary sources of explicit limitations on tribal sovereignty or political independence are treaties and federal legislation dealing with Indians; the Tribes do, however, retain those aspects of "sovereignty" not withdrawn. United States v. Wheeler, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978).
 
 
 111
 Indian treaties have not been interpreted narrowly, but have been construed so as to generously recognize the full obligation of the United States to protect the interests of a dependent people. Peoria Tribe of Indians of Oklahoma v. United States, 390 U.S. 468, 88 S.Ct. 1137, 20 L.Ed.2d 39 (1968). Accordingly, all doubtful expressions contained in treaties should be resolved in the Indians' favor, Choctaw Nation v. Oklahoma, 397 U.S. 620, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970), although the Congress has exclusive plenary legislative authority over Indians and all of their tribal relations. Lone Wolf v. Hitchcock, supra.
 
 
 112
 In the instant case there are no treaty rights involved, inasmuch as the Jicarilla Apache Tribe Reservation was carved out of the public domain and withdrawn by Executive order. A tribe occupying lands under a treaty has rights which are contractual in nature; however, a tribe occupying reservation lands by virtue of an Executive Order does so at the will of the Congress. Under either circumstance, i. e., creation of Indian reservations by treaty or Executive order, the exclusive plenary legislative authority of the Congress is superior when exercised. The "jurisdictional" problem relating to the applicable law of "Indian country" was discussed in Washington v. Yakima Indian Nation, 439 U.S. 463, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979):
 
 
 113
 Before the enactment of the state law here in issue, the Yakima Nation was subject to the general jurisdictional principles that apply in Indian country in the absence of federal legislation to the contrary. Under those principles, which received their first and fullest expression in Worcester v. Georgia, 6 Pet. 515, 517, (8 L.Ed. 483), state law reaches within the exterior boundaries of an Indian reservation only if it would not infringe "on the right of reservation Indians to make their own laws and be ruled by them." Williams v. Lee, 358 U.S. 217, 219-220 (79 S.Ct. 269, 270, 3 L.Ed.2d 251). 7 As a practical matter, this has meant that criminal offenses by or against Indians have been subject only to federal or tribal laws. Moe v. Salish & Kootenai Tribes, 425 U.S. 463, (96 S.Ct. 1634, 48 L.Ed.2d 96), except where Congress in the exercise of its plenary and exclusive power over Indian affairs has "expressly provided that State laws shall apply." McClanahan v. Arizona State Tax Comm'n., 411 U.S. 164, 170-171 (, 93 S.Ct. 1257, 1261, 36 L.Ed.2d 129) (Footnote omitted).
 
 
 114
 439 U.S. at pp. 470, 471, 99 S.Ct. at p. 746.
 
 
 115
 The Congress, of course, in the exercise of its plenary power over Indian affairs, may restrict the retained sovereign powers of Indian tribes. United States v. Wheeler, supra. This power was articulated in United States v. Mazurie, 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975):This court has recognized limits on the authority of Congress to delegate its legislative power. Panama Refining Co. v. Ryan, 293 U.S. 388 (, 55 S.Ct. 241, 79 L.Ed. 446) (1935). Those limitations are, however, less stringent in cases where the entity exercising the delegated authority itself possesses independent authority over the subject matter. United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 319-322 (, 57 S.Ct. 216, 220-222, 81 L.Ed. 255) (1936). Thus it is an important aspect of this case that Indian Tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory. Worcester v. Georgia, 6 Pet. 515, 557 (, 8 L.Ed. 483) (1832); they are "a separate people" possessing "the power of regulating their internal and social relations . . . ," United States v. Kagama, 118 U.S. 375, 381-382 (, 6 S.Ct. 1109, 1113, 30 L.Ed. 228) (1886); McClanahan v. Arizona State Tax Comm'n., 411 U.S. 164, 173 (, 93 S.Ct. 1257, 1261-1262, 36 L.Ed.2d 129) (1973).
 
 
 116
 . . . (W)hen Congress delegated its authority to control the introduction of alcoholic beverages into Indian country, it did so to entities which possess a certain degree of independent authority over matters that affect the internal and social relations of tribal life. Clearly the distribution and use of intoxicants is just such a matter. (Emphasis supplied).
 
 
 117
 419 U.S. at pp. 556, 557, 95 S.Ct. at pp. 717, 718.
 
 
 118
 The Supreme Court has recognized that Indian Tribes have separate, distinct rights of self determination constituting them "quasi-sovereign tribal entities." United States v. Wheeler, supra; Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978). These rights flow from the historical recognition of tribal political independence in the context of tribal-federal relations first declared in Worcester v. Georgia, supra, which involved the applicability of certain statutes enacted by the State of Georgia relative to reservation lands of the Cherokee Tribe. The Court held that the State statutes were not enforceable. While recognizing that Indian tribes are independent political communities possessing attributes of sovereignty over both their members and their territory, the Court nevertheless placed particular significance on the fact that the Constitution vested full control of Indian affairs in the Federal Government. In my view, the exclusivity of "control" indicated in Worcester, supra, was modified, at least interpretive-wise, by subsequent Supreme Court decisions which recognized the power of the states in specific areas over Indians and reservation lands providing that the power exercised does not infringe on the tribal powers of self-government which are part of the doctrine of tribal sovereignty, and, thus, those "inherent powers of a limited sovereignty" referred to in United States v. Wheeler, supra.
 
 
 119
 Applying the foregoing test, I conclude that it is incumbent upon the courts, on a case-to-case basis, to carefully scrutinize the power to be exercised in terms of the intended purpose and the interest to be served. Neither treaties or statutes dealing with Indian affairs relate or "speak" to many of the "jurisdictional" conflicts which have surfaced.
 
 
 120
 If statutes and treaties provide clear guidance relative to Congressional intent, no further inquiry is required. Thus, in the very area of our inquiry here (the power of the Indian Tribes to tax non-members on the Reservation lands) there are decisions upholding tribal tax assessments authorized by treaties, statutes or agreements with the United States. In Morris v. Hitchcock, 194 U.S. 384, 24 S.Ct. 712, 48 L.Ed. 1030 (1904), the Supreme Court upheld an act of the Chickasaw Nation imposing an annual per head privilege or permit tax on cattle and other animals owned by a non-Indian who was grazing animals under a lease on the Reservation lands. The Court specifically found the tax assessment to be authorized under both the terms of treaties entered into with the Five Civilized Tribes, and the Curtis Act. In Buster v. Wright, 135 F. 947 (8th Cir. 1905) the Court upheld a "permit tax" imposed by the Creek Indian Nation in the nature of a percentile levy on all goods offered for sale by non-member traders doing business on the Reservation lands. The Court relied upon Morris v. Hitchcock, supra, and Crabtree v. Madden, 54 F. 426 (8th Cir. 1893) in upholding the tax, i. e., the existence of the power and authority granted the Tribe under treaties and acts. Even so, the court did opine that in the absence of an Act of Congress, treaty or agreement with the United States, the Creek Nation would be empowered to impose the tax as " . . . one of the inherent and essential attributes of its original sovereignty". In Crabtree v. Madden, supra, the Court upheld an annual license tax of $200.00 assessed by the Creek Nation against non-member traders doing business on the Reservation based upon the power and authority reserved to the Tribe under the Treaty of August 7, 1856, 11 Stat., p. 703, Art. 15, which granted the Creeks the unrestricted right of self-government with full jurisdiction over persons and property within their limits. The Treaty provided that all persons not members of the Tribe were to be regarded as "intruders" subject to removal unless traveling through or "trading therein under license".
 
 
 121
 If, then, there are no treaties, statutes and agreements granting such power, the courts have been compelled to engage in the "balancing of interests" process. In this circumstance, the Supreme Court has recognized that non-Indians and their property interests within Indian reservations are subject to licensing enactments or ordinances. United States v. Mazurie, supra, involved the inherent power of the Tribe to grant or deny a liquor license to a non-Indian liquor dealer operating a retail business on non-Indian lands within the boundaries of the reservation. In like manner, tribal hunting and fishing licenses governing non-members who enter the reservations to hunt and fish have been grounded upon the inherent powers of the Tribe. Quechan Tribe of Indians v. Rowe, 531 F.2d 408 (9th Cir. 1976).
 
 
 122
 There are other areas where courts have been compelled to engage in the balancing of interest process. Thus, in Puyallup Tribe, Inc. v. Washington Game Department, 433 U.S. 165, 97 S.Ct. 2616, 53 L.Ed.2d 667 (1977), the State of Washington's conservation regulations dealing with an allocation of the total number of steelhead fish which could be netted by the Indians on the waters flowing through reservation lands was upheld as a proper conservation measure and not as an attempt to allocate the number of fish which could be netted by the tribe. To the same effect is Organized Village of Kake v. Egan, supra. The Court there upheld the State of Alaska's prohibition against the Thlinget Indians' use of salmon traps on waters flowing through the incorporated communities, notwithstanding Alaska's disclaimer in its Alaska Statehood Act relating to Indians, to-wit: (a) disclaimer of right and title to Indian property, and (b) recognition that the United States retains "absolute jurisdiction and control" over right and title of Indian property. Enriquez v. Superior Court, 115 Ariz. 342, 565 P.2d 522 (App.1977) held that a tribal court had jurisdiction in tort cases involving actions brought by a non-member against a tribal member resulting from an accident occurring on the reservation.
 
 
 123
 The Supreme Court has dealt with the "balancing of interests" problem in very few decisions. In Oliphant v. Suquamish Indian Tribe, supra, the Court held that Indian tribes lack criminal jurisdiction over non-members in the absence of specific Congressional authorization. The Court observed, inter alia :
 
 
 124
 Indian reservations are "a part of the territory of the United States." United States v. Rogers, 4 How. 567, 571 (, 11 L.Ed. 1105) (1846). Indian tribes "hold and occupy (the reservations) with the assent of the United States, and under their authority." Id., at 572. Upon incorporation into the territory of the United States, the Indian tribes thereby came under the territorial sovereignty of the United States and their exercise of separate power is constrained so as not to conflict with the interests of this overriding sovereignty. "(T)heir rights to complete sovereignty, as independent nations (are) necessarily diminished." Johnson v. M'Intosh, 8 Wheat. 543, 574 (, 5 L.Ed. 681) (1823).
 
 
 125
 435 U.S. at pp. 208, 209, 98 S.Ct. at p. 1021.
 
 
 126
 The Supreme Court, in Organized Village of Kake v. Egan, supra, following a review of a number of its prior decisions in this area of concern, observed:
 
 
 127
 These decisions indicate that even on reservations state laws may be applied to Indians unless such application would interfere with reservation self-government or impair a right granted or reserved by federal law.
 
 
 128
 369 U.S. at p. 75, 82 S.Ct. at p. 571.
 
 
 129
 The problems generated by the issue of the "exclusiveness" of federal jurisdiction were highlighted by this language contained in Mescalero Apache Tribe v. Jones, 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973):
 
 
 130
 . . . The upshot (of more individuality in treatment of certain treaties and specific federal statutes, including statehood enabling legislation as they, taken together, affect the respective rights of states, Indians and the Federal Government) has been the repeated statements of this Court to the effect that, even on reservations, state laws may be applied unless such application would interfere with reservation self-government or would impair a right granted or reserved by federal law. Organized Village of Kake, supra (, 369 U.S.) at 75 (82 S.Ct. at 570); Williams v. Lee, 358 U.S. 217 (, 79 S.Ct. 269, 3 L.Ed.2d 251) (1959); New York ex rel. Ray v. Martin, 326 U.S. 496, 499 (, 66 S.Ct. 307, 308, 90 L.Ed. 261) (1946); Draper v. United States, 164 U.S. 240 (, 17 S.Ct. 107, 41 L.Ed. 419) (1896).
 
 
 131
 411 U.S. at p. 148, 93 S.Ct. at p. 1270. See also: United States v. Mazurie, supra.
 
 
 132
 I would hold that the District Court did not err in finding that the Tribe's sovereign status does not extend to or allow the imposition of the challenged Tribal Severance Tax. In my view, the power of the Tribe to impose such a tax in these consolidated cases is clearly a political question which has not been explicitly addressed by the Congress. If the Congress intends that such power exists, it is incumbent that legislation be enacted explicitly so declaring. Until or unless the Congress affirmatively acts, I would hold that Tribe does not possess the right, power and authority to enforce the collection of its Tribal Severance Tax. My research discloses only two opinions which recognize the inherent power of an Indian tribe to enact and enforce a tribal ordinance assessing a tax upon a non-Indian's income from business conducted within reservation boundaries. Barta v. Oglala Sioux Tribe, 259 F.2d 553 (8th Cir. 1958) cert. denied 358 U.S. 932, 79 S.Ct. 320, 3 L.Ed.2d 304 (1959); Iron Crow v. Oglala Sioux Tribe, 231 F.2d 89 (8th Cir. 1956). I decline to adopt the broad interpretation of inherent tribal sovereignty power laid down in these opinions, and adopted by the majority here.
 
 
 133
 A significant aspect of the issue before us here involves recognition that the United States Government, as guardian, has enacted much legislation and appropriated significant amounts of federal funds for the direct, specific and exclusive benefit of its Indian wards. In like manner, the various states wherein the tribes reside have rendered state governmental aid and assistance in many important areas, utmost of which is perhaps the maintenance of the public schools. To what extent the Congress intends its beneficial enactments and appropriations to serve as exclusive means, I do not know. It is, however, my view that this involves a legislative judgment in the nature of a political question. The question of what involves "essential tribal relations" referred to in Williams v. Lee, supra, is, in my judgment a political question.
 
 
 134
 In positing the "inherent sovereignty" issues presented here as a political question for Congressional determination, I recognize that the United States Government, out of avowed solicitude for the welfare of its Indian wards who were considered " . . . a weak and defenseless people, who are wards of the nation, and dependent wholly upon its protection and good faith," Choate v. Trapp, 224 U.S. 665, 675, 32 S.Ct. 565, 569, 56 L.Ed. 941 (1912), undertook by treaties, statutes and executive orders to establish legal relations between the United States Government and the Indian Tribes which " . . . resembles that of a ward to his guardian." Cherokee Nation v. Georgia, 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1831). Implicit in the relationship thus created, in terms of "ownership" of the property set aside for the use, occupancy and benefit of the Indian tribes, is the fact that legal title, with its attendant aspect of dominion and ultimate control, vests in the United States, as guardian, with the right of use, benefit and occupancy vesting in the Indian wards. That relationship between the United States Government and the various Indian tribes, however, was never intended to be one of Indian servitude. Thus, the Supreme Court has held that the power of Congress over Indian affairs, though plenary in nature, is not absolute and that the standard of review recently applied is that legislative judgments should not be disturbed "as long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians." Delaware Tribal Business Committee v. Weeks, 430 U.S. 73, 85, 97 S.Ct. 911, 919, 51 L.Ed.2d 173 (1977); Morton v. Mancari, 417 U.S. 535, 555, 94 S.Ct. 2474, 2485, 41 L.Ed.2d 290 (1974).
 
 
 135
 The "Indian Sovereignty" doctrine cannot be equated with the governmental sovereignty of the United States Government. It is, however, of a "unique and limited character" existing at the sufferance of Congress and subject to complete defeasance. United States v. Wheeler, supra, 435 U.S. at p. 323, 98 S.Ct. at p. 1086. Tribal self government is rooted in the current federal policy of promoting tribal self-government, Bryan v. Itasca County, Minnesota, supra, which advances the social, institutional, political and cultural values peculiar to the respective tribes. The basic right of Indian internal self-government is directed to their right "of regulating their internal and social relations," out of recognition of their "semi-independent position when they preserved their tribal relations; not as States, not as nations, not as possessed of the full attributes of sovereignty, but as a separate people." United States v. Kagama, 118 U.S. 375, 381, 6 S.Ct. 1109, 1112, 30 L.Ed. 228 (1886).
 
 II.
 
 136
 In the context of the above analysis of the current federal policy, I now consider the status of Congressional judgment in the area of the challenged Tribal Severance Tax in weighing the preemption contention against the claim of inherent tribal sovereignty. If the Congress has explicitly addressed the subject matter, obviously there is no need for this Court to engage in the "balancing of interests" determination.
 
 
 137
 In my view, just as found by the District Court, there is clear congressional intent controlling in this case. I would hold that the enactment by the Congress on March 3, 1927, of 25 U.S.C.A. § 398c., 44 Stat. 1347, constituted clear, unambiguous legislative intent that only a "state or local authority" is empowered to levy and collect taxes upon the production from oil and gas wells produced and saved "upon lands within Executive order Indian reservations." That statute imposes one restriction only, i. e., that such taxes may not become a lien against Indian lands or property. The statute reads in full as follows:
 
 
 138
 § 398c. Same; taxes
 
 
 139
 Taxes may be levied and collected by the State or local authority upon improvements, output of mines or oil and gas wells, or other rights, property, or assets of any lessee upon lands within Executive order Indian reservations in the same manner as such taxes are otherwise levied and collected, and such taxes may be levied against the share obtained for the Indians as bonuses, rentals, and royalties, and the Secretary of the Interior is hereby authorized and directed to cause such taxes to be paid out of the tribal funds in the Treasury; Provided, that such taxes shall not become a lien or charge of any kind against the land or other property of such Indians. Mar. 3, 1927, c. 299, § 3, 44 Stat. 1347.
 
 
 140
 Tribe and the Secretary of the Interior contend that 25 U.S.C.A. § 398c. does not pertain or control. They argue, first, that Tribe, as an element of its sovereign status, is empowered to enact and enforce its severance tax ordinance and, second, that the Congressional enactment on May 11, 1938, of 25 U.S.C.A. § 396a. specifically governs the subject leases (and production therefrom) and does not permit state taxation of oil and gas produced within the Tribe's reservation. That statute reads as follows:
 
 
 141
 § 396a. Leases of unallotted lands for mining purposes; duration of leases
 
 
 142
 On and after May 11, 1938 unallotted lands within any Indian reservation or lands owned by any tribe, group, or band of Indians under Federal jurisdiction, except those specifically excepted from the provisions of this section by section 396f of this title, may, with the approval of the Secretary of the Interior, be leased for mining purposes, by authority of the tribal council or other authorized spokesmen for such Indians, for terms not to exceed ten years and as long thereafter as minerals are produced in paying quantities. May 11, 1938, c. 198 § 1, 52 Stat. 347.
 
 
 143
 I cannot accept the contentions of Tribe and the Secretary, with full recognition of the rule that limitations on tribal self-government cannot be implied from a statute or treaty but must be expressly stated or otherwise made clear from surrounding circumstances and legislative history. Bryan v. Itasca County, Minnesota, supra; Morton v. Mancari, supra. My review of the legislative history of 25 U.S.C.A. § 398c convinces me that the Congress did intend to grant States and local authorities the exclusive authority to tax non-Indian oil and gas lessees on production realized from their oil and gas operations conducted on Executive order Indian reservation lands. It has been held that Indian tribes are not "states". Native American Church v. Navajo Tribal Council, 272 F.2d 131 (10th Cir. 1959); Barta v. Oglala Sioux Tribe, supra. The Congressional discussions and debates relating to this legislation concentrated on the fact that Executive order reservation lands were not in the same category as those lands set aside under treaty to a tribe which "gave up" or "surrendered" ancestral or aboriginal rights in exchange therefor, but were, instead, simply set aside as a "gratuity" to the tribes from the United States. In the sense of the "balancing of interests" process, the Congress compromised the competing interests of the States and the tribes by authorizing the tribes to retain all of the royalties paid under the operating leases and the States to impose taxes on the production of oil and gas. (H.Rept.No.1791, 69th Cong., 2nd Sess., 69 Cong.Rec. 4580 (1927)). See also : (S.B. 876, 68th Cong., 2nd Sess., 66 Cong.Rec. 999 (1924); 66 Cong.Rec. 2234 (1925); 67 Cong.Rec. 10915 (1926).
 
 
 144
 I would reject Appellants' argument that the 1938 enactment of the Indian Mineral Leasing Act, 25 U.S.C.A. § 396a, et seq., repeals 25 U.S.C.A. § 398c. Although cognizant that statutes enacted for the benefit of the dependent Indian tribes are to be liberally construed and that doubtful expressions are to be resolved in favor of the Indians, Morton v. Mancari, supra, I would hold that because nothing in the Mineral Leasing Act of 1938 speaks to the subject of taxation of oil and gas produced from Indian lands and certainly nothing relating to Executive order reservation lands, there is lacking that required "clear intention" of provisions contained in a general statute necessary to effect repeal of or nullify the express terms of a specific statute, (25 U.S.C.A. § 398c.), regardless of the priority of enactment. Morton v. Mancari, supra; Colorado River Water Cons. Dist. v. United States, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976); Preiser v. Rodriguez, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973); Jicarilla Apache Tribe v. United States, supra; Glover Construction Company v. Andrus, 591 F.2d 554 (10th Cir. 1979); Sutherland, Statutory Construction, 4th Ed., Vol. 2A, § 51.05. Statutes must be construed as intended by the drafters when enacted in the light of conditions as they existed. United States v. Stewart, 311 U.S. 60, 61 S.Ct. 102, 85 L.Ed. 40 (1940).
 
 
 145
 In addition to reliance on repeal by implication of 25 U.S.C.A. § 398c. by enactment of 25 U.S.C.A. § 396a, et seq., Tribe further relies on the authority of the Indian Reorganization Act of June 18, 1934, 25 U.S.C.A. §§ 476-477.
 
 
 146
 In accordance with the Indian Reorganization Act, Tribe adopted a revised Constitution on December 23, 1968, subsequently approved by the Undersecretary of the Interior. The revised Constitution organized the tribal government into the tripartite departments of legislative, executive and judicial. The principal governing body is the tribal council consisting of elected members of the Tribe. Pertinent portions of the Tribe's revised Constitution are:
 
 Article XI, Section 1 provides:
 
 147
 The inherent powers of the Jicarilla Apache Tribe, including those conferred by Section 16 of the Act of June 18, 1934, (48 Stat. 984), as amended, shall vest in the tribal council and shall be exercised thereby subject only to limitations imposed by the Constitution of the United States, applicable Federal statutes and regulations of the Department of the Interior, and the restrictions established by this revised constitution. (Emphasis supplied).
 
 
 148
 Subparagraph (e) of Section 1, Article 10, provides:
 
 
 149
 (e) Taxes and fees. The tribal council may levy and collect taxes and fees on tribal members, and may enact ordinances, subject to approval by the Secretary of the Interior, to impose taxes and fees on non-members of the tribe doing business on the reservation.
 
 
 150
 Section 2 of Article 10 establishes the procedures for approval of tribal ordinances, which, in substance, provides that ordinances enacted be presented to the Superintendent, Bureau of Indian Affairs, Jicarilla Apache Agency, within ten days after approval by the Council, and that the Superintendent shall within ten days following receipt by him, transmit it to the Secretary of the Interior with his recommendation. The enactment becomes effective when approved by the Secretary, or if he does not act within 120 days following submittal to him. It was under authority thereof that the tribal council of Tribe on July 9, 1976, enacted its Oil and Gas Severance Tax Ordinance and further enacted a Severance Tax Permanent Fund Ordinance. These ordinances were subsequently approved by the Secretary of the Interior's delegate. The Tribal Severance Tax is expressly imposed on "any oil and natural gas severed, saved and removed from Tribal lands". The measure of the tax is 5 cents per million BTU of gas and 29 cents per barrel of crude oil or condensate produced on the Reservation and "sold or transported off the reservation ". All oil, gas or condensate representing (reserved) royalty gas "taken by the Tribe in kind and used by the Tribe", is exempt from the Tax.
 
 
 151
 Tribe does not and cannot point to any specific language in the Indian Reorganization Act of 1934 authorizing or empowering it to tax. In lieu of any such specific, clear language, Tribe relies upon (a) the stated purpose of the Act, i. e., freedom to organize for purposes of self-government and economic enterprise, and (b) an opinion rendered by the Solicitor to the Secretary of the Interior in 1934, identified as 55 I.D. 14, setting forth the purported intentions of Congress in enacting Section 16 of the Act. The opinion reads in part as follows:
 
 
 152
 Chief among the powers of sovereignty recognized as pertaining to an Indian tribe is the power of taxation. Except where Congress has provided otherwise, this power may be exercised over members of the tribe and over nonmembers, so far as such nonmembers may accept privileges of trade, residence, etc., to which taxes may be attached as conditions.
 
 
 153
 I conclude that under Section 16 of the Wheeler-Howard Act (Public No. 383, 73rd Congress) the "powers vested in any Indian tribe or tribal council by existing law", are those powers of local selfgovernment which have never been terminated by law or waived by treaty, and that chief among these powers are the following:
 
 
 154
 5. To levy dues, fees, or taxes upon the members of the tribe and upon non-members residing or doing any business of any sort within the reservation, so far as may be consistent with the power of the Commissioner of Indian Affairs over licensed traders.
 
 
 155
 Tribe contends that the Solicitor's opinion, rendered the same year the Act became effective, is the "best indication of Congressional intent available", citing to Squire v. Capoeman, 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883 (1956). (Brief of Tribe, In Chief, p. 24). A careful examination of the exact language employed by the court in Squire v. Capoeman, supra, is simply that "These relatively contemporaneous official and unofficial writings are entitled to consideration." 351 U.S. at p. 9, 76 S.Ct. at p. 616. I have considered them and find them wanting.
 
 
 156
 The only express language contained in the 1934 Act vesting rights and powers in a tribe or its tribal council, if organized under the terms of the Act is: To employ legal counsel, the choice of counsel and fixing of fees to be subject to the approval of the Secretary of the Interior; to prevent the sale, disposition, lease or encumbrance of tribal lands, interests in lands, or other tribal assets without the consent of the tribe; and to negotiate with the Federal, State, and local Governments. 25 U.S.C.A. § 476. The only conceivable language expressed in the § 476, supra, which the Solicitor's Opinion 55 I.D. 14 could have relied upon to "make the case" is that authorizing the various Indian tribes to organize under the Act "for its common welfare" and to adopt "an appropriate constitution and bylaws". Any reliance thereon, as support of Tribe's contention that the Act effectively repealed 25 U.S.C. § 398c, supra, is misplaced.
 
 
 157
 My interpretation of the interplay between these conflicting contentions is, I believe, in accord with a detailed analysis of a similar conflict set forth in Fort Mojave Tribe v. San Bernardino County, 543 F.2d 1253 (9th Cir. 1976), cert. denied, 430 U.S. 983, 97 S.Ct. 1678, 52 L.Ed.2d 377 (1976). In that case, California exercised civil and criminal jurisdiction over Indian country within its borders (but specifically exempted taxation of any real or personal property belonging to any Indian or Indian tribe) authorized under 28 U.S.C. § 1360(b). The court pertinently observed:
 
 
 158
 While the imposition of a possessory interest tax on the leasehold interest will have an economic effect on the Indian lessors, and perhaps, although not certainly, will reduce the amount of rent they will be able to collect the legal incidence of the tax clearly falls on the lessee. The lessor will never be personally liable for any delinquent taxes arising under this taxing statute . . . Under these circumstances, there cannot be a direct encumbrance on the lessor's reversionary interest. Similarly, the lease, apart from the lessor's reversionary interest, even if considered an asset of the tribe, is not directly encumbered simply because the amount of the tax is determined by the value of the leasehold. Whatever may be the scope of the indirect burden placed on the lessor's interest in this case, we hold that it is not sufficient to constitute an encumbrance of an "interest in land or other tribal asset."
 
 
 159
 Our conclusion is buttressed by the Supreme Court's decision in Mescalero Apache Tribe v. Jones, 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973). There the Court, relying on the statement that section 476 of the Act (The Indian Reorganization Act of 1934) was designed to encourage tribal enterprises "to enter the white world on a footing of equal competition," 78 Cong.Rec. 11732, found that traditional tax immunities had neither been expanded nor reduced by the Act. Mescalero, supra at 153-54 n. 9, 93 S.Ct. 1267 (at 1273 n. 9). Because the court would not imply tax exemptions absent clear statutory guidelines it upheld the imposition of a state tax on the gross receipts of a ski resort operated by the Mescaleros on land located outside the boundaries of their reservation. We follow that lead here and refuse to find that the Act created a tax exemption for non-Indian lessees of Indian land. Congress has given no clear indication that such a result was desired. When such a signal is given, the state and local governments must retreat.
 
 
 160
 Thus, we see that neither the Act nor PL-280 evidences a Congressional intent to preclude the taxation that is being challenged here. However, we cannot say that PL-280 directly authorizes such taxation. Bryan v. Itasca County, supra, forecloses the possibility of such a statement by specifically holding that the PL-280 grant of civil jurisdiction only confers jurisdiction over civil causes of action involving Indians. It is not a general grant of regulatory and taxing power over Indians. This is not, however, fatal to the state's cause. Although McClanahan, supra, held that, in the absence of Congressional consent, states are preempted from taxing Indian reservation lands or Indian income from activities carried on within the boundaries of the reservation, the court specifically did not deal with "exertions of state sovereignty over non-Indians who undertake activity on Indian reservations." McClanahan, supra at 411 U.S. 168, 93 S.Ct. at 1260. When the state action is directed at non-Indians, with only indirect effects on Indians or Indian lands, it is necessary to reconcile the federal preemption rationale with the state's recognized authority to regulate its citizens. McClanahan, supra at 179, 93 S.Ct. 1257 (, at 1266). Reconciliation requires that state legislation primarily directed at non-Indian lessees of Indian land be considered as not automatically preempted by the federal government in the absence of specific authorization . . . To permit such non-Indians to enjoy the immunity designed for Indians requires, we believe, a stronger Congressional signal than a statute which neither precludes nor authorizes the taxation in question. (Footnote omitted). (Emphasis supplied).
 
 
 161
 543 F.2d at pp. 1256, 1257.
 
 
 162
 I observe that in the case at bar a holding that the New Mexico State taxes levied against the proceeds of oil and gas produced by lessee Operators from Tribe's Reservation lands are valid based upon the express Congressional "signal" authorizing same, i. e., 25 U.S.C. § 398c, avoids any risk of permitting its imposition absent such clear Congressional consent. The Congress has expressly provided that the taxing laws of the various states extend over and apply to proceeds realized by non-Indian Operators from mineral exploration conducted on Executive Order Reservation lands. It is this power the court recognized in Warren Trading Post Co. v. Arizona State Tax Commission, 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965).
 
 
 163
 In its Reply Brief and Additional Brief filed prior to oral argument, Tribe relies upon the Natural Gas Policy Act of 1978, 15 U.S.C. §§ 3301, et seq., as express Congressional recognition of tribal authority to impose severance taxes on natural gas. 15 U.S.C. § 3320(c) defines, for purposes of the Act, "State Severance Tax" as any "severance, production, or similar tax . . . imposed on the production of natural gas . . . by any State or Indian Tribe." Tribe acknowledges that the conference report statement clearly shows that the Congressional conferees did not intend thereby to prejudge the outcome of cases then on appeal to this Court respecting the power of Indian tribes to impose taxes on non-Indians engaged in business activities on Indian reservations. In any event, I would hold that nothing in the language of the Natural Gas Act of 1978 can be interpreted as a Congressional grant of power to Indian tribes to enact and levy tribal severance taxes. The language is not, either expressly or impliedly, an affirmative grant of such power of taxation to Indian tribes.
 
 III.
 
 164
 I would hold that the District Court did not err in concluding that the Tribe's Severance Tax levied only against oil, gas or condensate produced on the Reservation and sold or transported off the Reservation is an unlawful multiple burden on and discriminatory against interstate commerce.
 
 
 165
 Tribe and Secretary contend that the severance tax ordinance is not in conflict with the commerce clause because the precise "triggering" event here is entirely "local" in nature, i. e., the tax is imposed on oil and gas when severed, saved and removed from tribal lands. From thence, it is contended that the eventual entry of oil and gas taxed locally upon severance from tribal property into interstate commerce outside of New Mexico does not thereby invalidate the tax. Thus, Tribe and Secretary, in effect, contend that the Tribe's tax is "insulated" by reason of the local nature of its application.
 
 
 166
 The record reflects that all of the gas provided by Appellee Marathon from Tribe reservation lands is sold in interstate commerce. (R., Vol. VI, p. 240). Some sixty percent of the production realized by Appellee Amoco is sold in interstate commerce. (R., Vol. VI, p. 229). Thus, inasmuch as the tax is not designed to apply until the oil and gas produced is "sold or transported off the reservation", I would hold that the incidence bears directly and discriminately against interstate commerce. Northwestern States Portland Cement Co. v. State of Minnesota, 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959); Southern Pacific Co. v. Gallagher, 306 U.S. 167, 59 S.Ct. 389, 83 L.Ed. 586 (1939); J. D. Adams Manufacturing Co. v. Storen, 304 U.S. 307, 58 S.Ct. 913, 82 L.Ed. 1365 (1938). A tax imposed on local activity related to interstate commerce is valid only if the local activity is not such an integral part of interstate process, the flow of commerce, that it cannot realistically be separated from it. Michigan-Wisconsin Pipe Line Co. v. Calvert, 347 U.S. 157, 74 S.Ct. 396, 98 L.Ed. 583 (1954). There a Texas tax on the occupation of "gathering gas", measured by the entire volume of gas "taken", as applied to an interstate natural gas pipeline company, where the taxable incidence is the taking of gas from the outlet of an independent gasoline plant within the State for the purpose of immediate interstate transmission, was held invalid under the Commerce Clause. The Commerce Clause is offended when, as here, the tax, by its very nature, makes interstate commerce bear more than its fair share. Central Greyhound Lines v. Mealey, 334 U.S. 653, 68 S.Ct. 1260, 92 L.Ed. 1633 (1948).
 
 
 167
 The Supreme Court has consistently struck down state laws which discriminately benefit (or may discriminately benefit) local or intrastate commerce at the expense of out-of-state or interstate commerce. In Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978) the Court held that the Commerce Clause protects the interstate market, and not particular firms from prohibitive regulations. Under this rationale, the Court observed that a state law does not discriminate against interstate commerce if it leaves the in-state and out-of-state businesses participating in the market on an equal competitive footing. In relation to the instant case, those businesses engaged in exclusive intrastate refining, marketing and distribution of oil and gas who purchase that portion of the oil and gas retained on the Tribe's land and thus not subject to the Tribal Severance Tax, would enjoy a discriminatory competitive advantage over those businesses supplying the oil and gas produced from the Reservation lands moving in interstate commerce. The in-state businesses would not be assessed the Tribe's Severance Tax, while the out-of-state businesses would. The impact would thus be an unequal competitive footing.
 
 
 168
 In Boston Stock Exchange v. State Tax Comm'n., 429 U.S. 318, 97 S.Ct. 599, 50 L.Ed.2d 514 (1977), the Supreme Court stated:
 
 
 169
 On various occasions when called upon to make the delicate adjustment between the national interest in free and open trade and the legitimate interest of the individual States in exercising their taxing powers, the Court has counseled that the result turns on the unique characteristics of the statute at issue and the particular circumstances in each case. E. g., Freeman v. Hewit, supra, (329 U.S. 249) at 252 (, 67 S.Ct. 274 at 276, 91 L.Ed. 265). This case-by-case approach has left "much room for controversy and confusion and little in the way of precise guides to the States in the exercise of their indispensable power of taxation." Northwestern States Portland Cement Co. v. Minnesota, 358 U.S. 450, 457 (, 79 S.Ct. 357, 362, 3 L.Ed.2d 421) (1959). Nevertheless, as observed by Mr. Justice Clark in the case just cited: "(F)rom the quagmire there emerge . . . some firm peaks of decision which remain unquestioned." Id., at 458 (, 79 S.Ct., at 362). Among these is the fundamental principle that we find dispositive of the case now before us. No State, consistent with the Commerce Clause, may "impose a tax which discriminates against interstate commerce . . . by providing a direct commercial advantage to local business." Ibid. See also Halliburton Oil Well Co. v. Reily, 373 U.S. 64 (, 83 S.Ct. 1201, 10 L.Ed.2d 202) (1963); Nippert v. Richmond, 327 U.S. 416 (, 66 S.Ct. 586, 90 L.Ed. 760) (1946); I. M. Darnell & Son v. Memphis, 208 U.S. 113 (, 28 S.Ct. 247, 52 L.Ed. 413) (1908); Guy v. Baltimore, 100 U.S. 434, 443 (, 25 L.Ed. 743) (1880); Welton v. Missouri, 91 U.S. 275 (, 23 L.Ed. 347) (1876). The prohibition against discriminatory treatment of interstate commerce follows inexorably from the basic purpose of the Clause. Permitting the individual States to enact laws that favor local enterprises at the expense of out-of-state businesses "would invite a multiplication of preferential trade areas destructive" of the free trade which the Clause protects. Dean Milk Co. v. Madison, 340 U.S. 349, 356 (, 71 S.Ct. 295, 299, 95 L.Ed. 329) (1951).
 
 
 170
 429 U.S. at p. 329, 97 S.Ct. at p. 606.
 
 
 171
 I would affirm the District Court.
 
 
 
 [1]
 In one of the essentially identical cases Gwendolyn Velarde, Treasurer of the Tribe, and Tony Martinez, Executive Director of the New Mexico Oil and Gas Accounting Commission, were named as individual defendants. Prior to trial Martinez was dismissed from the suit without prejudice
 
 
 [2]
 The pretrial order recites that the Tribe, pursuant to a resolution of its Council, "waived any claim to sovereign immunity for the determination of the legal validity of this tax." No question of immunity of the Tribe from suit was raised until it filed a reply brief in this Court
 
 
 [3]
 Even were we to conclude the ordinance did not constitute effective consent, it is clear that the court properly reached the merits in one of the cases consolidated for trial. Plaintiffs Amoco Production Company and Marathon Oil Company, in addition to naming the Tribe and Tribal Council as defendants, sued individually the tribal official charged with the enforcement and collection of the tax. The Tribe's immunity from suit does not extend to tribal officials; therefore the trial court properly heard this case. Santa Clara Pueblo v. Martinez, 436 U.S. 49, 59, 98 S.Ct. 1670, 1677, 56 L.Ed.2d 106 (1978)
 
 
 [4]
 The Stevedoring case, building upon Complete Auto Transit eliminated the distinction between direct and indirect taxation of interstate commerce when the tax is measured by gross proceeds. 435 U.S. at 743-51, 98 S.Ct. at 1395-1400. With that distinction fell the per se rule forbidding taxation of interstate commerce. Id.; 430 U.S. at 287-89, 97 S.Ct. at 1083-84. A tax falling within the ambit of these cases is valid if it "is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." 430 U.S. at 279, 97 S.Ct. at 1079. See id. at 287, 97 S.Ct. at 1083; 435 U.S. at 750-51, 98 S.Ct. at 1399-1400. We need not decide whether a severance tax measured by quantity produced within a single jurisdiction falls within the ambit of this new doctrine. Obviously the questioned tax falls on activity production with a substantial nexus with the reservation. The tax does not raise the apportionment problem because it is measured by quantity, and as we have determined, it does not discriminate against interstate commerce. If the Stevedoring and Complete Auto Transit analysis applied, the only question is whether the tax is fairly related to services provided by the reservation. Lessees did not build a factual foundation in the record to challenge the tax on this ground, since they relied upon the rejected per se rule. Thus there is no basis on which to hold the tax invalid on this ground. See 435 U.S. at 750-51, 98 S.Ct. at 1399-1400
 
 
 [5]
 The Tribe also argues that New Mexico has no power to levy its severance tax on production within the reservation. Its argument in essence is that the General Leasing Act of 1938, ch. 198, 52 Stat. 347 (codified at 25 U.S.C. §§ 396a-396g), which makes uniform the laws applicable to leasing of mineral rights on Indian reservations, and does not contain a specific grant of power to the states comparable to that found in the Act of March 3, 1927, ch. 299, § 3, 44 Stat. 1347 (codified at 25 U.S.C. § 398c), repealed the latter provision. See § 7, 52 Stat. 347. Because the State of New Mexico is not a party to this litigation and we hold the State's power to tax, if any, is not exclusive, we do not reach this question. For the same reasons we do not address the Tribe's contention that the trial court erred in not allowing the Tribe to put the leases into evidence to show whether they were granted under § 398c or under § 396a
 
 
 [6]
 25 U.S.C. § 396b provides:
 Leases for oil- and/or gas-mining purposes covering such unallotted lands shall be offered for sale to the highest responsible qualified bidder, at public auction or on sealed bids, after notice and advertisement, upon such terms and subject to such conditions as the Secretary of the Interior may prescribe. Such advertisement shall reserve to the Secretary of the Interior the right to reject all bids whenever in his judgment the interest of the Indians will be served by so doing, and if no satisfactory bid is received, or the accepted bidder fails to complete the lease, or the Secretary of the Interior shall determine that it is unwise in the interest of the Indians to accept the highest bid, said Secretary may readvertise such lease for sale, or with the consent of the tribal council or other governing tribal authorities, a lease may be made by private negotiations: Provided, That the foregoing provisions shall in no manner restrict the right of tribes organized and incorporated under sections 476 and 477 of this title, to lease lands for mining purposes as therein provided and in accordance with the provisions of any constitution and charter adopted by any Indian tribe pursuant to sections 461, 462, 463, 464-475, 476-478, and 479 of this title.
 (Emphasis added).
 
 
 [7]
 The Secretary of the Interior has implemented by regulation the substance of the proviso as follows:
 The regulations in this part may be superseded by the provisions of any tribal constitution, bylaw or charter issued pursuant to the Indian Reorganization Act of June 18, 1934 (48 Stat. 984; 25 U.S.C. §§ 461-479), . . . or by ordinance, resolution or other action authorized under such constitution, bylaw or charter. The regulations in this part, in so far as they are not so superseded, shall apply to leases made by organized tribes if the validity of the lease depends upon the approval of the Secretary of the Interior.
 
 
 [25]
 C.F.R. § 171.29 (1979)
 
 
 [1]
 "The Congress shall have Power . . . To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes . . . ." U.S. Const. art. 1, § 8